CARPENTERS LOCAL 470, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 76–2324.

United States Court of Appeals, Ninth Circuit.

Nov. 28, 1977.

David B. Condon of Griffin & Enslow, Tacoma, Wash., for petitioner.

Charles M. Henderson, Seattle, Wash., for respondent.

Before CARTER, TRASK and KENNEDY, Circuit Judges.

TRASK, Circuit Judge:

Carpenters Local Union No. 470 (Union) petitioned this court to review an NLRB order, and the NLRB petitioned for enforcement of its order. The order, reported at 224 NLRB 21 (1976), holds that the Union's picketing violated the secondary boycott provision of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(i) and (ii)(B).[1] Since the unfair labor practice occurred in Tacoma, Washington, this court has jurisdiction pursuant to 29 U.S.C. § 160(e) and (f). For reasons set forth below, we affirm the Board's decision.

The Union has been involved in a labor dispute with Mueller-Anderson, Inc., a general contractor and developer of the apartment complex where the alleged unfair labor practice occurred. In addition to its own employees, Mueller-Anderson hired several subcontractors to assist in the construction of this apartment complex. Shortly before April 2, 1975, Mueller-An-

---

1. 29 U.S.C. § 158(b)(4)(i) and (ii)(B) provides as follows:

(b) It shall be an unfair labor practice for a labor organization or its agents—

 *   *   *   *   *

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

 *   *   *   *   *   *

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing; . . . ."

derson posted signs at the two main entrances to the job site. The sign at the 105th Avenue entrance prohibited anyone but employees and suppliers of six specified subcontractors from using that gate; the sign at the 116th Street entrance prohibited anyone but employees and suppliers of Mueller-Anderson itself and four specified subcontractors from using that gate. Despite these signs, Mueller-Anderson's employees used both gates.

From April 2, 1975 to April 6, 1975, the Union picketed Mueller-Anderson only at the 116th Street gate. During April 7 and 8, the Union picketed at both gates.

At the end of the day on April 8, Mueller-Anderson reversed the location of the signs and notified the Union of the change by letter. In that letter it asked the Union to terminate its picketing at the 116th Street gate, noting that the picketing had already induced some of a subcontractor's employees to stop working. It also stated that it intended to enforce the gate restrictions "without qualification" and asked the Union to "bring any apparent violations of these reserved gates to our attention so that we can take corrective action immediately." Finally, the letter stated that if the Union continued to picket at the 116th Street gate, it would be forced to file unfair labor practice charges with the National Labor Relations Board. From April 9 onward Mueller-Anderson's employees observed the signs and only used the 105th Avenue gate. However, the Union continued to picket at both gates. As a consequence, an increasing number of employees of the subcontractors refused to work at the job site. Since the Union refused to restrict its picketing to the gate used by Mueller-Anderson's employees, Mueller-Anderson filed a charge with the Board. The Board found that the Union's picketing at both gates after the signs had been reversed violated section 158(b)(4)(i) and (ii)(B). Title 29, United States Code.

The key to determining whether section 158(b)(4)(i) and (ii)(B) was violated here is to identify the object of the Union's picketing at both gates. *NLRB v. Northern Cal. Dist. Coun. of Hod Carriers,* 389 F.2d 721, 725 (9th Cir. 1968). The Union argues that the Board applied the wrong test to determine the object of the picketing. The Board utilized the guidelines set forth in *Sailors Union of the Pacific,* 92 NLRB 547, 549 (1950) (hereinafter *Moore Dry Dock* ). The Union contends that the proper test is that set forth in *Electrical Workers v. Labor Board,* 366 U.S. 667, 680–81, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961) (hereinafter *General Electric* ).

■ We agree with the Board that the *Moore Dry Dock* rule, and not the *General Electric* rule, is the proper test to be applied in cases such as the present one which involve a general contractor and neutral subcontractors working together at a construction job site. *Linbeck Const. Corp. v. NLRB,* 550 F.2d 311, 316 (5th Cir. 1977); *NLRB v. Nashville Building & Construction Trades Coun.,* 425 F.2d 385, 390 (6th Cir. 1970). The *General Electric* case held that the legality of picketing at a plant entrance reserved for neutral subcontractors turns on whether the subcontractors' work is "unconnected to the normal operations of the struck employer." 366 U.S. at 680–81, 81 S.Ct. at 1293. The Court noted that "if a separate gate were devised for regular *plant* deliveries, the barring of picketing at that location would make a clear invasion on traditional primary activity of appealing to neutral employees whose tasks aid the employer's everyday operations." *Id.* at 681, 81 S.Ct. at 1293 (emphasis added). In the same opinion, however, the Court endorsed the *Moore Dry Dock* criteria as the proper test for picketing at common situs construction projects. *Id.* at 676–80, 81 S.Ct. 1285. Hence, the Supreme Court's "related work" doctrine of *General Electric* was devised for the everyday operations of an industrial plant or commercial enterprise, and was not intended to alter the Board's *Moore Dry Dock* approach towards resolving the legality of union picketing at common situs construction projects.

■ Since we affirm the Board's choice of the *Moore Dry Dock* test as the proper evidentiary aid for identifying the object of the instant picketing, we need only determine whether the Board's finding are sup-

ported by substantial evidence in the record as a whole. *Labor Board v. Denver Bldg. Council,* 341 U.S. 675, 691, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). The Union continued to picket at the gate reserved for neutral subcontractors after being notified that the signs had been reversed. The Board inferred from this fact, pursuant to the third criterion set forth in *Moore Dry Dock* (that picketing be limited to places reasonably close to the location of the situs), that the object of the Union's picketing was to induce the subcontractors' employees to force their employers to stop doing business with Mueller-Anderson. On the other hand, the Union argues that what should be inferred is that the object was primary. In light of the Union's duty to picket with restraint, we believe the Board's inference is more plausible. We hold that its decision is supported by substantial evidence.

The order of the Board is ENFORCED.