**INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND ORNAMENTAL IRON WORKERS, LOCAL NO. 433, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 77–3743.

United States Court of Appeals, Ninth Circuit.

April 23, 1979.

Rehearing Denied June 26, 1979.

David A. Rosenfeld (argued), San Francisco, Cal., for petitioner.

Elliott Moore, Norman A. Moscowitz (argued), Washington, D. C., for respondent.

Before WALLACE and TANG, Circuit Judges, and WHELAN,* District Judge.

WALLACE, Circuit Judge:

This case is before us on a Petition for Review and Application for Enforcement of

* Honorable Francis C. Whelan, United States District Judge, Central District of California, sitting by designation.

a decision of the National Labor Relations Board (Board) holding that a union local had committed certain unfair labor practices in connection with two days of picketing at a common situs construction project. We grant enforcement of the Board's Decision and Order with respect to the Board's finding of a violation on the second day of picketing and deny enforcement with respect to the first day.

I

On May 16, 1977, members of the International Association of Bridge, Structural and Ornamental Iron Workers, Local No. 433 (Union) began picketing a construction site where R. F. Erection, a subcontractor, was installing elevator fronts. The construction site, the Pacific Terrace Center, adjoining the Long Beach Marina, is surrounded on all four sides by a chain-link fence. Three gates provide access to the job site. The main gate, on the north side, is used by most of the employees on the project. The office gate, on the west side, provides access to trailers inside the fence which serve as offices for contractors on the project. A third, less used gate, is located on the south side of the project.

On May 16, and again on May 17, the Union picketed both the main and office gates with signs identifying its dispute with "R. F. Erectors [sic]." The employees of all subcontractors, except the three that employed iron workers on the project, continued to work on May 16, and also apparently on May 17.

On May 18, project superintendent Page, who was employed by Robert E. McKee, Inc., the general contractor, attempted to establish a reserve gate system, restricting the use of particular gates to employees of particular subcontractors. Thus, signs were posted at both the main and office gates stating: "This gate for employees of Robert E. McKee, Inc., and subcontractors only. R. F. Erectors [sic] excluded." On the south side of the project, at a third gate formerly used by other employees, Page posted a sign that stated: "This gate for R. F. Erectors [sic] only." Page also sent a telegram to the Union informing it of these actions. The telegram arrived that morning and was addressed to the Union, "attention Joe Ward," the Union's business agent. He testified that he did not find out about the telegram, and thus the gate restrictions, until he called the Union office at 2 p. m. to 2:30 p. m. that day. He then proceeded to the job site, but the pickets had already left. They had not restricted their activities to the "R. F. Erectors" gate that day. That evening Ward called the pickets, telling them that they could picket only at the south gate.

On May 19, the next day, the pickets did restrict their activities to the gate designated for employees of "R. F. Erectors." Business agent Ward and a job steward, Larken, were, however, at the office and main gates, respectively, that morning. On the basis of their actions, the Board concluded that the Union had engaged in an unfair labor practice. Specifically, the Board held that Ward and Larken had, as an object of their activities that morning, signaled to neutral employees on the project that the Union desired that they continue to remain off of the job. In fact, no employees worked on the job that day. The Board found that both the signaling on May 19 and the continued picketing in defiance of the reserve gate system on the preceding day, May 18, had an unlawful, secondary object and thus constituted unfair labor practices within the meaning of sections 8(b)(4)(i) and 8(b)(4)(ii)(B) of the National Labor Relations Act, as amended, 29 U.S.C. §§ 158(b)(4)(i), (ii) (B) (1976).[1]

---

1.  29 U.S.C. § 158(b) provides in part:

    It shall be an unfair labor practice for a labor organization or its agents—

    (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting

## II

"The key to determining whether section 158(b)(4)(i) and (ii)(B) was violated here is to identify the object of the Union's picketing at [the] gates." *Carpenters Local 470 v. NLRB,* 564 F.2d 1360, 1362 (9th Cir. 1977) (citing *NLRB v. Northern Cal. Dist. Council of Hod Carriers,* 389 F.2d 721, 725 (9th Cir. 1968)). As we stated in *Carpenters Local 470,* the guidelines that the Board established in *Sailors' Union of the Pacific (Moore Dry Dock),* 92 N.L.R.B. 547, 549 (1950), provide the proper test for determining the legality of union picketing at common situs construction projects. *Carpenters Local 470 v. NLRB, supra,* 564 F.2d at 1362; *see Linbeck Constr. Corp. v. NLRB,* 550 F.2d 311, 316 (5th Cir. 1977). In the case before us, the only conflict centers around the third *Moore Dry Dock* criterion, specifically, whether "the picketing is limited to places reasonably close to the location of the *situs*" of the dispute. 92 N.L.R.B. at 549.[2]

The initial question before us is whether superintendent Page effectively established a "reserve gate system." The reserve gate system is a method by which secondary (neutral) employers may restrict the situs of a dispute with the primary employer to a particular area or areas.

The Supreme Court has authorized employers at a common situs to set up separate gates through which the primary employees and secondary employees may enter. By maintaining a separate gate for access to the site, the employees, suppliers, and deliverymen of neutral employers operating at a common situs, thus, can be insulated from disputes involving other employers at the site, in that pickets can operate only at the gate of the employer with whom they have a grievance.

*Linbeck Constr. Corp. v. NLRB, supra,* 550 F.2d at 316 (citation omitted); *accord, Local 519, United Ass'n of Journeymen v. NLRB,* 135 U.S.App.D.C. 105, 110, 416 F.2d 1120, 1125 (1969); *see Local 761 Int'l Union of Elec., Radio & Mach. Workers v. NLRB (General Electric),* 366 U.S. 667, 680, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961); *Carpenters Local 470 v. NLRB, supra,* 564 F.2d at 1362–63.[3]

The Union argues that because both the signs and the telegram failed to make any provision for *suppliers* of R. F. Erection, reserve gates were not effectively established, and the Union could properly continue to picket at all three gates. The Board contends that because supplies for the R. F. Erection job were already located on the job site, failure to include suppliers in the signs did not affect the reserve status of the gates.

While we agree with the Union that the failure to include suppliers in the signs is important to the status of the gates, we do not believe that this failure necessarily is

---

commerce, where in either case an object thereof is—

> .    .    .    .    .
>
> (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person . . . : *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing; . .  . .

(Emphasis in original.)

2. In *Moore Dry Dock,* the Board articulated a total of four guidelines that aid our determination of the propriety of particular common situs picketing:

> (a) The picketing is strictly limited to times when the *situs* of dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in its normal business at the *situs;* (c) the picketing is limited to places reasonably close to the location of the *situs;* and (d) the picketing discloses clearly that the dispute is with the primary employer.

92 N.L.R.B. at 549 (footnotes omitted).

3. As stated in the text, in cases of common situs construction projects, the *Moore Dry Dock* principles are guiding. The *General Electric* requirement that the neutral employers' work be "unrelated" to that of the primary, 366 U.S. at 681, 81 S.Ct. 1285, is not applicable in such cases. *Carpenters Local 470 v. NLRB,* 564 F.2d 1360, 1362 (9th Cir. 1977); *Linbeck Constr. Corp. v. NLRB,* 550 F.2d 311, 316 (5th Cir. 1977).

dispositive of the issue. It is important to remember that the focus of our inquiry is the "object" of the Union's actions. Thus, we conclude that a per se rule is neither wise nor necessary.

In advocating a per se rule, the Union relies on *Linbeck Constr. Corp. v. NLRB, supra:*

> Several Board decisions, holding that failure of gate signs to indicate that suppliers of the primary must use the primary's gate *alone* removes the secondary gates from the protection from picketing normally accorded them, reveal the importance of the right to direct pickets toward gates used by the suppliers.

550 F.2d at 317 (emphasis added). Such a broad view was not necessary to the decision in *Linbeck* itself. Nor do we believe that the three cases found by *Linbeck* to establish a per se rule actually go that far.

The court in *Linbeck* rested its decision on the functions of those persons actually using the various gates. *Id.* at 317–18. In the cited passage of *Linbeck,* the court was merely identifying the importance of picketing a primary supplier as a policy consideration in deciding that legal ownership of supplies by a neutral employer did not render unfair union picketing of the delivery of those materials to the primary employer. The adequacy of gate signs was not in question.

In two of the cases cited in this passage of *Linbeck,* the breakdown of the reserve gate system was also considered in determining the propriety of the picketing. *See IBEW Local 441 (Jones & Jones, Inc.),* 158 N.L.R.B. 549, 552 (1966) (major emphasis on confusion engendered by signs, as evidenced by failure of primary employees and delivery persons to observe restrictions); *Local 519, United Ass'n of Journeymen (Center Plumbing & Heating Corp.),* 145 N.L.R.B. 215, 223 (1963) (fence at construction area was "in reality a sieve," and there were at least four incidents where suppliers or employees of the primary employer used the secondary gate).

*West Ky. Bldg. & Constr. Trades Council (Daniel Constr. Co.),* 192 N.L.R.B. 272 (1971), does contain language that goes further toward developing a per se rule in this regard. The Board observed that "the failure to designate each of the gates as also restricted to suppliers of the contractors authorized to use them and the failure to notify [the union] of such restriction rendered ineffective [the employer's] efforts to insulate persons using the [secondary] gate from the picketing." *Id.* at 277. In a footnote, the Board stated that "this finding [made it] unnecessary to consider further evidence introduced as to whether the actual use of the gates complied with the restrictions placed on them." *Id.* at 277 n.18. The Board's suggestion here, that the failure to include suppliers on the signs is irrelevant because the supplies were stored on the site and none were brought through any of the gates during the picketing, does not square with its own analysis in *Daniel.*

We believe, however, that there is an aspect of this case that does distinguish it from *Daniel.* Here, the Board affirmed the findings by the hearing officer that the Union's business agent, Ward, called the pickets to tell them to restrict their picketing to the "R. F. Erectors" gate, and that the picketers did in fact confine their picketing the following day to that gate. We believe that, at least when the Union has affirmatively demonstrated such a recognition that a reserve gate system has been effectively established, the presence or absence of such technical factors as the inclusion of suppliers in the signs is not determinative.

In this regard, it must be remembered that the *Moore Dry Dock* rule is only an evidentiary tool. *NLRB v. Northern Cal. Dist. Council of Hod Carriers, supra,* 389 F.2d at 725; *see, e.g., Linbeck Constr. Corp. v. NLRB, supra,* 550 F.2d at 319. Thus, "the inference of primary activity raised by compliance with the *Moore Dry Dock* standards may be dispelled if the totality of the circumstances [indicates] the union's" objective is secondary. *Carpenters Dist. Council v. NLRB,* 560 F.2d 1015, 1018 (10th Cir. 1977); *accord, Local 369, IBEW (Garst-Receveur Constr. Co.),* 229 N.L.R.B. 68, 72

(1977); *see Local 519, United Ass'n of Journeymen v. NLRB, supra,* 135 U.S.App.D.C. at 110, 416 F.2d at 1125.

Simply put, the cases cited in *Linbeck* merely establish that the Union *could,* under some circumstances, lawfully picket the "secondary" gates, not that it did so lawfully here. Our focus must always be on the *object* of the Union's activities. If the Union has demonstrated a belief that a reserve gate system has been established, yet seeks to circumvent this system, a fair inference may be drawn that the Union's objects are secondary.

### III

With this perspective, we now face the particular allegations of misconduct which are before us in this appeal. We consider in turn the Union's activities on each of the two days in question.

### A.

■ As detailed above, in mid-morning on May 18, superintendent Page set up signs at each of the gates and sent a telegram to the Union notifying it of this action. Business agent Ward testified that he did not learn of the existence of the telegram, and thus the signs, until sometime that afternoon, and that by the time he had reached the site, the pickets had already left.

While the telegram, on its arrival, constitutes notice to the Union of the employer's attempt to establish a reserve gate system,[4] that does not provide an answer to the precise question before us: can it be said the Union believed that a reserve gate system had been established? There is nothing in the record which shows any response to the telegram by the Union until Ward made his afternoon telephone call. Under these circumstances, and absent anything in the record to indicate otherwise, we cannot say that the Union affirmatively acknowledged the existence of a reserve gate system prior to the termination of the day's picketing activities. Together with the deficiency in the signs, this finding leads us to conclude that there is not substantial evidence to sustain the Board's finding that the picketing on May 18 had a secondary object and was thus unlawful.[5]

### B.

■ The activities of May 19 present more difficulty. The Union did not picket the main and office gates, as such, that day. Rather, the Board found that Larken and Ward had engaged in "signal picketing."[6] We have concluded that picketing would not be appropriate at the main and office gates once the Union recognized the reserve gate system. As to the second day, there is no question that this recognition had oc-

4. Because we conclude that the signs here were insufficient to establish a reserve gate system without some affirmative recognition of such a system by the Union, it is unnecessary for us to decide what constitutes proper notice to the Union when the signs themselves *are* correctly prepared. That is, we do not reach the question whether the employer must notify officials directly that he intends to establish a reserve gate system, or whether simply placing properly designated signs at the appropriate entrances to the jobsite is sufficient in and of itself. *Cf. Laborers Local 1290 (Walters Foundation, Inc.),* 195 N.L.R.B. 370, 371 (1972) (the change of a "primary gate only a half day after its establishment, and the failure to give notification of such change to responsible union officials as had been done in the past and as requested," contributed to Board determination that union picketing did not have secondary object).

5. Our conclusion, *infra,* that there is substantial evidence on the record to sustain the Board's finding that the picketing on the 19th was unlawful does not affect this determination, at least under the circumstances of this case. That is, absent something in the record to show that the Union recognized the legitimacy of the reserve gate system prior to the close of picketing on May 18, we will not let our conclusion that such recognition occurred prior to commencement of picketing on May 19 control our evaluation of the preceding day's activities.

Our resolution of the events of May 18 obviates the need to consider other issues raised by the Union regarding them.

6. "Signal picketing" is the term used to describe activity, short of a true picket line, which acts as a signal to neutrals that sympathetic action on their part is desired by the Union.

curred. Not only were all picketers at the reserve gate, but Ward testified that he called the picketers to tell them to restrict their picketing to the gate reserved for R. F. Erection. These facts establish Union recognition of the reserve gate system beyond any doubt.

The only question, then, is whether the Board's finding that Ward and Larken did indeed engage in signal picketing is "supported by substantial evidence in the record as a whole." *Carpenters Local 470 v. NLRB, supra,* 564 F.2d at 1362–63 (citing *NLRB v. Denver Bldg. & Constr. Trades Council,* 341 U.S. 675, 691, 71 S.Ct. 943, 95 L.Ed. 1284 (1951)).

The Union suggests that to find that it has engaged in signal picketing in this case would "expand the doctrine" because there is no precedent for such a finding on facts such as those involved here. This argument misses the point. The determination is one that must be made on a case-by-case basis. While other cases may demonstrate that generally it is more extreme conduct that earns the label of "signal picketing," they do not limit the applicability of the doctrine to certain facts. Since the inquiry focuses upon the object of the union's activities, it is necessary to look at the unique factual circumstances in each case.[7]

Before turning to the facts of this case, we emphasize the delicate nature of common situs picketing. While a union has a right to express itself, that expression must be restricted so as to affect only primary employees. In this regard, the Fifth Circuit has adopted "a requirement that the picketing union do everything that is reasonably necessary to insure that secondary employees are not misled or coerced into observing the picket line." *Ramey Constr. Co. v. Local 544, Painters,* 472 F.2d 1127, 1131 (5th Cir. 1973). "[T]his requirement places a heavy burden on the picketing union to convince the trier of fact that the picketing was conducted in a manner least likely to

encourage secondary effects." *Id.* We, too, have stated that unions have a "duty to picket with restraint." *Carpenters Local 470 v. NLRB, supra,* 564 F.2d at 1363; accord, *Local 98, United Ass'n of Journeymen v. NLRB,* 497 F.2d 60, 65 (6th Cir. 1974). We think that this principle is also applicable to other conduct of members and officials of a union engaged in a labor dispute at a common situs job project. The Union here had a duty to act with restraint.

In this case, the Union does not seriously dispute the underlying facts, as found by the Board. The only question centers on the inference of signal picketing which the Board then drew from these facts. Superintendent Page sent for business manager Ward on the morning of May 19. After the two of them talked in the construction office, Page observed Ward at the office gate between 6:30 a. m. and 7 a. m. Page testified that Ward was still standing there sometime between 8:30 a. m. and 9 a. m. Ward testified that he waited for a Board representative for one and a half to two hours. Page testified that he saw Ward "carrying on some conversation with various trades, plumbers, fitters, and ironworkers, too." There was, however, no testimony as to what Ward may have said to the various persons to whom he talked near the gate during that time.

Assistant superintendent Braverman observed Union shop steward Larken at the project at the main gate about 6:30 a. m. to 6:45 a. m. Braverman testified that there were "close to 100" people standing outside the main gate. He saw Larken standing around the coffee wagon and talking to several persons.

Finally, as was the case the day before, no employees worked on the project on May 19.

On the basis of this evidence, the Board concluded that the Union had engaged in signal picketing which had a secondary object in violation of the Act. We find there

---

7. *Of course, a case seemingly identical to this one in which the Board did not find signal picketing would raise questions as to why the Board did so in this case. The inquiry remains,* however, whether there is substantial evidence to support the Board's finding of an unlawful object in the Union's activities in this case.

is substantial evidence to sustain this finding. While the Union argues that both Ward and Larken had legitimate reasons to be at the gates where they were seen—Ward to speak with Page, Larken to report for work, and both to keep pickets away from neutral gates—the evidence demonstrates that Ward remained at the office gate for a significant time after his meeting with Page, and that both Ward and Larken had spoken with various persons, including employees of neutral employers, none of whom reported for work that day. Moreover, Ward himself testified not that he was at the gate to police the pickets, but rather that he was waiting for a Board agent, testimony disbelieved by the Board. Neither did Ward suggest any basis for believing that his pickets, whom he had called the night before and whom he testified he had observed respecting the reserve gate system, would venture over to the other gates, or any reason why; if he were concerned about the possibility that they would leave the gate set aside for R. F. Erection, he could not have prevented this by staying at that gate.

We cannot say that the inference that Ward and Larken impermissibly induced or encouraged employees of neutral employers to stay off the job is inadequately supported by the record as a whole.[8]

We grant enforcement of the Board's Decision and Order only with respect to the May 19 violation. Enforcement is denied as to the alleged May 18 violation.

ENFORCEMENT GRANTED IN PART AND DENIED IN PART.

8. The case of *Local 453, IBEW (Southern Sun Elec. Corp.),* 237 N.L.R.B. No. 104 (1978), brought to our attention by counsel for the Union shortly before oral argument, is not dispositive of this case. In *Southern Sun,* the Board stated that based on the facts of that case, it was clear that the reserved areas were delineated in such a manner that the union there had no reasonable assurance "that its message would be carried to all within the legitimate, direct appeal of its picket sign." *Id.* at 4. The Union now argues to us that the location of the reserve gates in this case also suffers from the same inadequacy. We believe that *Southern Sun* involves only a question of fact to be resolved on a case-by-case basis. This issue was not raised before the Board, and there is nothing whatsoever in the record to indicate that the Union believed that it was not able to convey its message effectively to "all within the legitimate, direct appeal of its picket sign." As we have already stated, the Union showed significant recognition of the effective establishment of a reserve gate system in this case.