996 F.2d 1226
 148 L.R.R.M. (BNA) 2320
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
IRON WORKERS LOCAL UNION NO. 378, Respondent.
 No. 91-70726.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 15, 1993.
Decided June 24, 1993.
 
 Before FERGUSON, CANBY and BRUNETTI, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 The National Labor Relations Board (NLRB) petitions the court for enforcement of its remedial order against the Iron Workers Local Union No. 378 (the Union) based on the Union's violations of the secondary boycott provisions of the National Labor Relations Act (the Act). The Union opposes enforcement of the NLRB's order and challenges the NLRB's findings of unfair labor practices.
 
 
 3
 The Union had a primary labor dispute with R & S Erection (R & S), a supplier and erector of metal buildings. Bishop-Wisecarver Corporation (B-W) operated a facility in Pittsburg, California. In April, 1989, B-W hired N.E. Carlson (Carlson) to act as general contractor in the construction of a warehouse on B-W's land. Carlson in turn sub-contracted some of the work on the site to R & S. The NLRB's findings of illegal secondary boycott activity are based on incidents which occurred during the Union's picketing campaign against R & S at the B-W site.
 
 
 4
 The NLRB found that the Union violated the secondary boycott provisions of the National Labor Relations Act, 29 U.S.C. § 8(b)(4)(i)(ii)(B), by threatening and coercing neutral employees on three occasions and by engaging in illegal picketing at Gate 3 of the construction site on September 21-22 and October 4-5, 1989. We uphold a NLRB decision if its findings are supported by substantial evidence in the record and if the NLRB has properly applied the law. United Ass'n. of Journeymen v. NLRB, 912 F.2d 1108, 1110 (9th Cir.1990).
 
 
 5
 The NLRB found that Union business manager Larry Trujillo violated the Act when he (a) threatened to picket the neutral gates during a meeting with two neutral employees and (b) asked a neutral employee, in threatening terms, why he was crossing the picket line.
 
 
 6
 As a preliminary matter, the Union argues that the NLRB should not have been permitted to amend its complaint on the first day of the hearing to include the allegations about Trujillo. The Union argues that the amended allegations violate the Act's six month statute of limitations. 29 U.S.C. § 160(b). The Act itself provides that a complaint may be amended "at any time prior to the issuance of an order based thereon." Id. Trujillo's acts were part of the same course of conduct as the picketing at the B-W construction site. See NLRB v. Inland Empire Meat Co., 611 F.2d 1235, 1237-38 (9th Cir.1979). Thus the allegations in the amended complaint do not violate the statute of limitations. Id.
 
 
 7
 The Union disputes that Trujillo said he would picket all three gates at the site and contends that Trujillo's statements evidenced an intent to do nothing more than effectively picket the jobsite. The ALJ found that Trujillo did threaten to picket all three gates. The ALJ credited neutral B-W employee Jonathan Erickson's testimony over Trujillo's, finding Erickson to be a more credible witness because as a union member and a shop steward, he was testifying against union solidarity. The ALJ added that other witnesses testified that Trujillo made similar statements to them on other occasions.
 
 
 8
 We accept the ALJ's credibility determinations "in the absence of a clear preponderance of all the evidence that the determination is incorrect." NLRB v. Ramona's Mexican Food Products, Inc., 531 F.2d 390, 393 (9th Cir.1975). We are particularly deferential to the ALJ's credibility determination when he " 'provides a written statement of reasons for choosing not to believe the [witness'] story.' " Id. (quoting NLRB v. Magnusen, 523 F.2d 643 (9th Cir.1975)). Although Glenn Nielson, Erickson's union representative, did not corroborate Erickson's exact testimony, Nielson did state that he understood Trujillo to intend to disrupt the entire job site. Furthermore, the ALJ gave a detailed explanation of why he credited Erickson's testimony over Trujillo's. Thus we accept the credibility determination of the ALJ.
 
 
 9
 The Union contends that Trujillo's statements to Erickson and Nielson were not threats to engage in prohibited activity. The Union relies on our decisions in NLRB v. Ironworkers Local 433, 850 F.2d 551 (9th Cir.1988) and United Ass'n of Journeymen v. NLRB, 912 F.2d 1108 (9th Cir.1990) (applying Ironworkers Local 433). In Ironworkers Local 433, we held that there is no per se presumption that a union's threat to picket a primary employer at a common job site has an unlawful purpose. Ironworkers Local 433, 850 F.2d at 557. We assess the legality of a union's statement based on how, "given the context of the conversation, the union's statements should reasonably be understood." Id.
 
 
 10
 Both Erickson and Nielson met with Trujillo to work out a compromise so neutrals would not be in the uncomfortable position of crossing a union picket line. Trujillo refused to submit to a compromise, and instead communicated his intent to disrupt the B-W manufacturing facility. Even assuming that Trujillo did not say the exact words, "we're going to picket all three gates," both Erickson and Nielson perceived his unwillingness to compromise as an expression of intent to disrupt the entire B-W site. Trujillo's statements were thus more than general threats to boycott the primary at a common site. Compare id. at 556.
 
 
 11
 Given the context of Trujillo's conversation with Erickson and Nielson, there is substantial evidence in the record to support the NLRB's finding that a reasonable neutral employee would presume that Trujillo intended to conduct the Union's picketing in an unlawful manner. Compare id. at 557 (union's statement that they would picket "the job" was said in a context where a reasonable neutral employer would understand that "the job" meant the work to be performed by the primary employer).
 
 
 12
 The NLRB found that the Union violated the Act when Trujillo confronted Erickson while Erickson was crossing the picket line. Trujillo asked Erickson, in crude terms, why he was crossing the picket line and whether he did whatever he was told. It is a violation of the Act for a union member to impermissibly induce or encourage neutral employees to stay off the job. Iron Workers Local 433 v. NLRB, 598 F.2d 1154, 1155 and n. 1 (9th Cir.1979). Trujillo's statements clearly evidenced an intent to coerce Erickson to honor the picket line. Thus we uphold the NLRB's finding.
 
 
 13
 The NLRB also found that the Union violated the Act on the morning of August 30, when neutral Carlson employee William Mittan was verbally threatened by a picket at Gate 3. Like Trujillo's statements to Erickson, the picket's assault was a clear violation of the Act.
 
 
 14
 The Union contends that it should not be held responsible for the incident with Mittan because the picket's actions were not sanctioned by Trujillo. However, the record is replete with instances of clear violations of the Act by Trujillo and others. Furthermore, Trujillo was present when the incident occurred. Although Trujillo belatedly silenced the picket, he did not dismiss him from picket duty until the following day. The Union " 'instigated, authorized, solicited, ratified, condoned or adopted' the statements and unlawful conduct" of the picket, and thus can be held accountable for his conduct. Iron Workers Dist. Council of Pac. Northwest v. NLRB, 913 F.2d 1470, 1477 (9th Cir.1990) (citation omitted).
 
 
 15
 The NLRB found that the Union violated 29 U.S.C. § 158(b)(4)(i)(B) when it picketed at Gate 3 of the B-W construction site on September 21-22 and October 4-5, 1989.[1] The key to determining whether section 8(b)(4)(i)(b) of the Act has been violated is to identify the object of the union's picketing. Electrical Workers Local 761 v. NLRB, 366 U.S. 667, 672-73 (1961); Carpenters Local 470 v. NLRB, 564 F.2d 1360, 1362 (9th Cir.1977).
 
 
 16
 In common-situs construction cases, courts have adopted evidentiary criteria, known as the Moore Dry Dock standards, to aid in determining whether the Union has the requisite illegal intent. See id. at 1362 (adopting the Moore Dry Dock criteria established by the NLRB in Sailors Union of the Pacific (Moore Dry Dock Co.), 92 NLRB 547, 549 (1950)). The reserve gate system at a common construction site is an attempt to implement a system that complies with the Moore Dry Dock standards. Constar, Inc. v. Plumbers Local 447, 748 F.2d 520, 522 (9th Cir.1984).
 
 
 17
 The NLRB found that the Union violated the third Moore Dry Dock criterion, which requires that the picketing take place reasonably close to the situs of the primary dispute. Gate 1, the gate for R & S workers, was the situs of the primary dispute, but the Union picketed at Gate 3 on the four days in question. The NLRB further found that the Union failed to rebut the presumption that picketing at Gate 3 had an unlawful purpose, and that the totality of the circumstances supported a finding that the Union had an illegal intent.
 
 
 18
 First, we consider whether the reserve gate system was properly established. Iron Workers Local 433, 598 F.2d at 1156. As of August 29, Gates 1 and 2 were posted with signs limiting access to Gate 1 to R & S and its suppliers, and access to Gate 2 to all others and their suppliers. The Union received two telegrams about the reserve gate system, one on August 29 and another on August 30. On September 8, Gate 3 was posted with a sign prohibiting its use by all construction workers. Substantial evidence in the record supports the conclusion that by September 21, the Union knew that a dual gate system had been established. Compare id. at 1156-58 (finding that deficiencies in the gate signs and the union's lack of awareness that it had received a telegram informing it of the dual gate system defeated the NLRB's conclusion that the Union's picketing at a reserve gate had a secondary object).
 
 
 19
 The Union contends that they were prevented from complying with the gate system because of a state temporary restraining order (TRO) that limited them to having two pickets at each gate. They further contend that the police threatened to arrest them if they didn't picket at the neutral gates. However, the Union stipulated to the fact that the TRO expired on September 18. The Union does not allege that any threats of arrest took place on the four days at issue here. While the TRO and its ill-advised enforcement by the police certainly added to the Union's confusion about where to picket prior to September 18, there is no evidence in the record that the TRO influenced the Union's picketing choices after September 18.
 
 
 20
 The Union also contends that "gate pollution" by R & S employees on two occasions privileged them to picket at Gate 3. The Union states that Trujillo observed an R & S employee enter through Gate 3 on September 20, and therefore sent pickets to Gates 1 and 3 on September 21-22. The ALJ did not credit Trujillo's testimony, and instead explained that he believed the testimony of the R & S employee Trujillo claimed to have observed, who stated that he did not drive the vehicle described by Trujillo to the jobsite. The ALJ's credibility determination was neither "inherently incredible [n]or patently unreasonable." NLRB v. Anthony Co., 557 F.2d 692, 695 (9th Cir.1977). Thus we affirm the NLRB's determination that there was no gate pollution warranting the Union's picketing at Gate 3.
 
 
 21
 The Union also alleges an instance of gate pollution on October 4. Wesley Bruer, a Union picket, and Gerald Balmer, a Union business manager, testified that they observed an R & S truck pull up to Gate 3, park for roughly 30 minutes while the driver went into the office and the passenger waited in the truck, and then pull out and go to Gate 1. The ALJ concluded that this observation was not significant enough to counter the abundance of record evidence that the Union never had any intention of limiting its picketing to Gate 1. The ALJ's finding is buttressed by the fact that the Union also picketed at Gate 3 on the following day, October 5, despite having received a telegram from Carlson that reestablished the reserve gate system without admitting that any pollution had occurred. Compare Constar, Inc., 748 F.2d at 521-22 (finding no violation of the Act where the union was careful to picket the polluted gate only until the employer reestablished the reserve gate system); see also Iron Workers Local 433, 598 F.2d at 1158.
 
 
 22
 Finally, the Union asserts, based on Balmer's testimony, that Gate 1 was inaccessible to ingress and egress on the days in question. Therefore, the Union argues, its picketing at Gate 3 does not evidence an intent to enmesh neutrals. However, Balmer's testimony does not support the Union's contention. First, blockage of Gate 1 could not account for the picketing on September 21-22, since Balmer's testimony only referred to October 4-5. Second, Balmer testified that it would be impossible for vehicles to enter and exit through Gate 1, but that he observed R & S employees parking and working near Gate 1, and that it was possible to walk through the gate. Compare Plumbers and Steamfitters Local 398 v. NLRB, 261 NLRB 482 (1982) (finding that while the union reasonably believed that the primary employees could not use the primary gate because it was impossible for motor vehicles to enter or leave through it at any time during the particular day in question, the union did intend to enmesh neutrals when it remained at that gate the following day despite accessibility through the primary gate and a complete lack of evidence that primary employees used the neutral gate). Substantial evidence in the record supports the NLRB's conclusion that, considering the totality of the circumstances, Balmer's testimony does not suffice to rebut the presumption that the Union had an intent to enmesh neutrals in its dispute with R & S.
 
 
 23
 The NLRB modified the recommended order of the ALJ to include a broad cease and desist order prohibiting the Union from committing any future violations of the Act's secondary boycott provisions. We review the NLRB's selection of remedies for an abuse of discretion. NLRB v. C.E. Wylie Constr. Co., 934 F.2d 234, 236 (9th Cir.1991). Although courts have recognized that the NLRB's discretion is "exceedingly broad," id., we review the NLRB's decision with a higher level of scrutiny when it issues a broad cease and desist order. We do so because such an order exposes the affected party to potential contempt sanctions for future violations. See id. at 237.
 
 
 24
 We recognize that orders confined to the particular parties have little effect in the construction context, where job sites are only temporary, but this alone does not give the NLRB license to issue broad orders absent an express finding of likely recidivism. Thus the NLRB must make a finding that the offending party "is likely to commit similar violations at other sites." Id. at 238.
 
 
 25
 The NLRB based its broad order on a finding that the Union had violated the secondary boycott provisions twice within slightly more than a year. In Iron Workers Local 378 (McDevitt & Street Co.), 298 NLRB No. 143 (1990), the Union had been found to violate the secondary boycott provisions of the Act for substantially similar activity as in this case. The NLRB noted that Larry Trujillo was also the business manager at the McDevitt & Street site. The NLRB concluded that the Union's violations "are so egregious as to manifest a general disregard for the rights of neutral employees and employers."
 
 
 26
 We cannot conclude that this finding is an abuse of discretion. We recognize that the TRO and police harassment created confusion for the Union in early September. Furthermore, if the NLRB finding were based on the illegal picketing alone, the broad order could not stand. However, Trujillo's persistent and intentional flouting of the reserve gate system, coupled with the violations a year earlier at McDevitt & Street, which also involved Trujillo, support the NLRB's finding that the Union is likely to persist in its disregard for the rights of neutrals.
 
 CONCLUSION
 
 27
 We AFFIRM the NLRB's findings and GRANT the NLRB's petition for enforcement.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The Union maintains that no picketing occurred at Gate 2 on the dates in question. The record corroborates the Union's contention. Both the ALJ in his decision and the NLRB in its brief refer to picketing at Gate 2 on September 21-22. However, the ALJ's conclusions, adopted by the NLRB in its final decision, only refer to violations occurring at Gate 3. The NLRB, in its decision and order, only refers to the Union's illegal picketing at a neutral gate. Therefore, we need only consider the findings of illegal picketing at Gate 3