HAWAII ELECTRIC LIGHT
COMPANY, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 1186, AFL–CIO, Defendant.

HAWAII ELECTRIC LIGHT
COMPANY, Plaintiff,

v.

UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, LOCAL 745, AFL–CIO, Defendant.

Civ. Nos. 92–00198 HMP, 92–00199.

United States District Court,
D. Hawaii.

Dec. 16, 1993.

Robert S. Katz, Jeffrey S. Harris, Torkildson Katz Jossem Fonseca Jaffe & Moore, Honolulu, HI, for plaintiff.

Sean Kim, Park Kim & Yu, Honolulu, HI, for International Broth. of Elec. Workers, Local Union 1186, AFL–CIO.

James K. Tam, Rex K.C. Kim, Dale L. Bennett, Michael F. O'Connor, Moon, O'Connor, Tam & Yuen, Honolulu, HI, for United Broth. of Carpenters and Joiners of America, Local Union No. 745, AFL–CIO.

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

FONG, District Judge.

### INTRODUCTION

On December 13, 1993 the court heard cross motions for summary judgment. Plaintiff Hawaii Electric Light Company ("HELCO") filed their motion for summary judgment on September 16, 1993; an amended motion was filed on September 20, 1993. Defendant International Brotherhood of Electrical Workers, Local 1186, AFL–CIO (the "Electricians") filed a memorandum in opposition on November 22, 1993. Defendant United Brotherhood of Carpenters and Joiners of America, Local 745, AFL–CIO (the "Carpenters") filed a memorandum in opposition on November 24, 1993. Plaintiff filed a reply on December 2, 1993.

The Electricians filed a cross-motion for summary judgment on November 1, 1993; a supplemental memorandum was filed on November 4, 1993. Plaintiff filed a memorandum in opposition to the cross motion for summary judgment on November 22, 1993.

### BACKGROUND

HELCO generates and distributes electricity on the island of Hawaii serving approximately 52,000 industrial, commercial and residential customers. The Electrical Workers

represents HELCO's production and maintenance employees.

By late 1991, due to its aging means of production, HELCO lacked sufficient generating capacity to meet peak usage by its customers and at the same time perform necessary service maintenance. As a result, HELCO asked its customers to curtail electricity usage during peak demand hours and instituted rolling blackouts. To address the shortage, HELCO contracted for construction of a new generator. Completion was scheduled for August, 1992. Until completion, there was an increasing risk of rolling blackouts as well as total shutdown.

The construction project ("Puna CT3 Power Plant" or the "project") was located on the site of HELCO's existing steam generator plant in Keeau, Hawaii. The plant burned oil to manufacture electricity and was scheduled to remain in production during construction of the new generator. Approximately 12 of HELCO's production employees worked there; Yamada & Son, a union employer, delivered oil to the plant. The project was accessible from Mamalahoa Highway or Pahoa Road over roughly one-half mile of access roads.

HELCO hired Stone and Webster Engineering Corp. ("Stone") to engineer and manage the project. Almost 90% of the work was awarded to union contractors including Swinerton and Walberg ("Swinerton"), Howard Engineers & Constructors, Ltd. ("Howard"), and CBI Services, Inc. ("CBI"). The remainder of the project was awarded to two non-union contractors: Jas. A. Glover, Ltd. ("Glover") (1%) and Diversified Energy Services, Inc. & Lyman Electric Joint Venture ("DES") (less than 10%).

The final phase of construction was scheduled to begin on March 27, 1992. On March 13, 1992 the Carpenters' business agent John Davis ("Davis") came to the project site. He told Stone's site resident engineer David W. Zito ("Zito") that it "looked like the job had problems." Zito asked Davis whether he meant "back there, above ground" or in the other direction "below ground," referring to the locations of the non-union contractors DES and Glover. Davis replied that there were problems in both places and asked if

Stone had picked the non-union contractors. Zito relayed that it had been HELCO's decision. Davis asked who at HELCO had permitted non-union bidders and reiterated that there would be difficulties with the project due to the non-union contractors. Davis also said that other project workers were unhappy and that "HELCO had other sites."

Due to this "warning" and to prevent any problems between the non-union contractors and the union employees from disrupting the project, HELCO established and maintained a reserved gate system at the project site beginning March 25, 1992. A "primary gate" was reserved exclusively for the non-union contractors Glover and DES, their employees and their suppliers; at the primary gate was posted a large sign stating:

### PRIMARY GATE

THIS GATE IS RESERVED EXCLUSIVELY FOR THE USE OF DES/LYMAN (JV) & JAS. GLOVER, THEIR EMPLOYEES AND THEIR SUPPLIERS.

ALL OTHER PERSONS MUST USE A NEUTRAL GATE.

The primary gate was located in front of the center of the project site.

There were also two "neutral gates." At both neutral gates, reserved for persons other than GLOVER, DES, their employees and their suppliers (i.e. all union employees), there was a large sign prominently posted which stated:

### NEUTRAL GATE

THIS ENTRANCE IS RESERVED EXCLUSIVELY FOR THE USE OF PERSONS OTHER THAN DES/LYMAN (JV) & JAS. GLOVER, THEIR EMPLOYEES AND THEIR SUPPLIERS.

DES/LYMAN (JV) & JAS. GLOVER, THEIR EMPLOYEES AND THEIR SUPPLIERS MUST USE THE PRIMARY GATE.

The neutral gates were located on either side of the primary gate in front of the north and south corners of the front of the project site.

Glover and DES were notified that the reserved gate system was being established and maintained at the project. They were directed to have their employees and suppliers enter and exit only through the primary gate. Glover and DES maintained the reserved gate system in all except one instance. On April 21, 1992 a Glover supervisor entered through a neutral gate looking for a lost pile driver; the supervisor spent approximately three minutes inside the vicinity of the neutral gate looking for the driver and then exited immediately thereafter.

The union contractors, including Swinerton, Howard and CBI were also notified that the reserved gate system was being established and maintained at the project. They were advised that their employees and suppliers must enter and exit only through the neutral gates.

Guards from Hawaii Protective Association ("HPA") were hired and posted at the three gates to prevent any violence, damage to property or use of the incorrect gates.

The Carpenters were notified of the reserved gate system on March 27, 1992. They were given a map of the project showing the locations of the primary gate and the neutral gates and were advised that any picketing of the non-union contractors would have to occur at the primary gate.

On March 30, 1992 the Carpenters started picketing. On March 30, 1992 and March 31, 1992 they picketed the primary gate carrying signs stating:

THE HAWAII CARPENTERS UNION, LOCAL 745, AFL–CIO, PROTESTS THE SUBSTANDARD WAGES, HOURS AND CONDITIONS OF EMPLOYMENT ON THIS JOB BY JAS. W. GLOVER. THE HAWAII CARPENTERS UNION, LOCAL 745, AFL–CIO, DOES NOT INTEND BY THIS PICKET LINE TO INDUCE OR ENCOURAGE THE EMPLOYEES OF ANY OTHER EMPLOYER TO ENGAGE IN A STRIKE OR CONCERTED REFUSAL TO WORK. THIS PICKET LINE SUPPLIED BY THE HAWAII CARPENTERS UNION, LOCAL 745, AFL–CIO.

Employees of all union and non-union contractors entered the project through the appropriate gates and worked on March 30 and 31, 1992 except Swinerton who stated that its employees would report to work on April 1, 1992.

However, on April 1, 1992 the Carpenters picketed the two neutral gate; the picket signs were the same as used the day before at the primary gate. As a result of the neutral gate picketing, none of the union contractors' employees entered the project; the non-union contractors' employees continued to work. In addition, Yamada & Son's drivers refused to deliver oil for several hours.

On April 2, 1992, the Carpenters' picketers again congregated at the neutral gate and displayed picket signs. After the initial congregation, most picketers moved to the primary gate for the rest of the day on April 2, 1992 and all day on April 3, 1992. Davis remained at the neutral gate for several hours; in addition, another union representative logged vehicles outside the neutral gate for HELCO, its employees and suppliers on April 2, 1992 and April 3, 1992.

The project site was picketed by the Carpenters from March 30, 1992 until April 3, 1992. On April 6, 1992 the Carpenters moved its picketers to all intersections between Mamalahoa Highway, Pahoa Road and the other country roads and the access roads about one-half mile from the site (four intersections). The picketers patrolled these intersections carrying signs with the same epitaph as those carried at the project site from March 30—April 3, 1992.

Also on April 6, 1992 the Electricians joined the Carpenters. Its pickets patrolled alongside Carpenter's pickets and carried signs stating:

DES/LYMAN IS UNFAIR IT IS A NON-UNION SHOP

Or:

DES/LYMAN IS UNFAIR IT IS A NON-UNION SHOP LOCAL 1186 IBEW

The stated reason for moving the picketing to these intersections was that the access road leading directly to the plant was a private road owned by the Shipman estate and

the Carpenters and the Electricians feared that if they used the road to gain access to the project site they would be prosecuted for trespassing. HELCO had an easement to use the road and the Shipman estate has never prosecuted anyone for using the access road.

As a result of the intersection picketing, all the union contractors' employees ceased working. Yamada & Son's employees refused to deliver oil. Non-union contractors' employees continued to work.

The Electricians had been notified of the reserve gate system on April 6, 1992. They were given a map showing the locations of the primary gate and the neutral gates and advised that any picketing of non-union contractors must be restricted to the primary gate. The Electricians never picketed at the project site itself.

The Electricians continued to picket all intersections from April 6—April 8, 1992. On April 8, 1992, an additional reserve entrance was established at the intersections. From April 9—April 29, 1992 the Carpenters and the Electricians restricted their picketing to the intersection designated as the primary entrance. However, union men remained stationed at the other intersection.

On April 21, 1992 the National Labor Relations Board ("NLRB") issued a complaint against the picketing. On the same day, Davis entered the site and approached a union contractor's employee working on the project and told him that by working he was violating union bylaws.

On April 22, 1992, the Carpenters resumed picketing at all four intersections. Davis acknowledged that he was picketing a neutral entrance. Again, as a result of the picketing, none of the union contractors' employees entered the project and Yamada and Son's employees refused to deliver oil.

The Carpenters returned to the primary intersection entrance from April 23—April 28, 1992. However, Davis and others yelled and swung their arms in a threatening manner at individuals using the other intersections. As a result, the reserve entrance system at the intersections was removed leaving only the reserve entrance system at the site in effect.

The Carpenters then attempted to establish its own reserve entrance system. This system seems to have failed because the Carpenters resumed picketing at the primary gate rather than the intersections and continued doing so for May and June 1992.

On June 26, 1992, the NLRB amended its complaint to cover these recent events. The Carpenters subsequently withdrew its answer denying that any of its picketing was unlawful and consented to entry of judgment restraining further picketing. The Electricians settled.

HELCO claims that the picketing was an illegal secondary picketing under § 8(b)(4)(B) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 158(B)(4)(B). As a result of this alleged illegal picketing HELCO claims the following damages:

| | |
|---|---|
| claim by Howard: | $ 39,116.00 |
| claim by CBI: | $ 8,354.25 |
| claim by DES: | $ 72,709.00 |
| service by HPA: | $116,714.40 |
| service by Shikuma: | $ 5,298.80 |
| total | $242,192.45 |

The Carpenters and the Electricians argue in response that the picketing was legal. The Electricians in their cross motion for summary judgment argue that due to their fear of prosecution for trespass if they used the private access road, the picketing at the intersections was legal because the intersections were the positions closest to the project site. In opposing HELCO's motion for summary judgment they also argue that there are disputed material factual issues, both as to appropriateness of the placement of the primary and neutral gates and also as to the exact amount of damages. The Carpenters argue in opposition to HELCO's motion for summary judgment that HELCO has not satisfied its burden of proof under Rule 56 because the evidence submitted in support of HELCO's motion is inadmissible. They also join the Electricians in arguing the propriety of the gate placement and the measure of damages.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered when:

> ... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The moving party has the initial burden of "identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). The movant need not advance affidavits or similar materials to negate the existence of an issue on which the opposing party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553.

If the moving party meets its burden, then the opposing party must come forward with "specific facts showing that there is a genuine issue for trial" in order to defeat the motion. Fed.R.Civ.P. 56(e); *T.W. Elec.*, 809 F.2d at 630. The opposing party cannot stand on the pleadings nor simply assert that it will discredit the movant's evidence at trial. *Id.* "If the factual context makes the [opposing] party's claim *implausible*, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Cal. Arch. Bldg. Prods. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.1987) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

The standard for summary judgment reflects the standard governing a directed verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)). When there is a genuine issue of material fact, "the judge must assume the truth of the evidence set forth by the [opposing] party with respect to that fact." *T.W. Elec.*, 809 F.2d at 631. Inferences from the facts must be drawn in the light most favorable to the non-moving party. *Id.*

## DISCUSSION

### I. Secondary Picketing

Section 8(b)(4)(B) of the LMRA, 29 U.S.C. § 158(b)(4)(B), forbids secondary picketing. *Chipman Freight Services, Inc. v. N.L.R.B.*, 843 F.2d 1224, 1227 (9th Cir.1988), cert. denied 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988). Secondary picketing is picketing which is calculated to involve neutral employers and employees in the union's dispute with primary employer. *Id.*, 843 F.2d at 1226. A union may picket a primary employer at a job situs under the control of a secondary employer only if the picketing is primary in nature. *N.L.R.B. v. Ironworkers Local 433*, 850 F.2d 551, 554 (9th Cir.1988). To determine whether picketing at a common situs is primary or secondary, a four part test is applied:

(1) whether the picketing is strictly limited to times when the situs of the dispute is located on the secondary employer's premises;

(2) whether the primary employer is engaged in its normal business at the situs;

(3) whether the picketing takes place reasonably close to the situs; and

(4) whether the picketing discloses that the dispute is with the primary employer.

*Iron Workers District Council v. N.L.R.B.*, 913 F.2d 1470, 1475 (9th Cir.1990); *Sailors' Union of the Pacific Moore Dry Dock Co.*, 92 N.L.R.B. 547, 549 (1950). Unless picketing satisfies all four criteria, it is presumed to be secondary and therefore unlawful. *Id.* However, even compliance with all four of the *Moore Dry Dock* criteria will not necessarily insulate a union from a § 8(b)(4)(B) violation if other evidence shows an intention to involve neutrals, and hence a secondary objective. *International Ass'n of Bridge, Structural and Ornamental Iron Workers, Local No. 433 v. N.L.R.B.*, 598 F.2d 1154, 1157 (9th Cir.1979); *Iron Workers District Council*, 913 F.2d at 1476.

In addition, when an employer establishes a valid reserve gate system, picketing at neutral gates is unlawful secondary picketing. *Local Union No. 76 v. N.L.R.B.*, 742 F.2d 498, 501 (9th Cir.1984). A reserve gate system requires separate gates for primary and secondary employees that are clearly marked and set apart. *Id.* To destroy a reserve gate system, there must be "substantial mixed use of a gate" before picketing is permissible at a neutral gate. *Id.* There is no exception for picketing to obtain publicity. *Electrical Workers IBEW Local 970 (Interox America)*, 306 N.L.R.B. No. 8 (1992). Finally, the union has a heavy burden to conduct any picketing in the manner least likely to have secondary effects. *International Ass'n of Bridge, Structural and Ornamental Iron Workers, Local No. 433*, 598 F.2d at 1159.

The Carpenters' and the Electricians' picketing of HELCO was unlawful secondary picketing. The Carpenters and the Electricians repeatedly picketed neutral gates. The Carpenters and the Electricians have presented no evidence that indicates that the neutral gates were tainted. In addition, picketing one-half mile down the road when the employer established a reserve gate system on the site itself cannot be said to be picketing reasonably close to the situs.

The Carpenters' and the Electricians' sole argument in defense of their activity is that the choice of the sites for the neutral gates was inappropriate because they were located at the end of a private road and the unions feared prosecution for trespass. This contention is without merit for three reasons. First, both the Carpenters and the Electricians were given permission by HELCO to access HELCO property in order to picket at the primary gate. Rejected invitations to picket on private property establish a secondary objective of picketing elsewhere, despite lack of explicit assurances against trespassing prosecutions. *Retail Clerks 1017 v. N.L.R.B.*, 249 F.2d 591, 598 (9th Cir.1957); *Laborers 383 (Hensel Phelps)*, 268 N.L.R.B. 129 (1983). Carpenters and Electricians also argue that HELCO did not have the power to give them permission to use the access roads. However, HELCO has unlimited and undisputed license in its easement to allow invitees to use the access roads. Second, any

fear of trespass prosecution should have been allayed by the Carpenters' one week use of the road between March 30—April 3, 1992 which took place without incident and without prosecution. Finally, the access road is routinely used by the public and no individual has ever been prosecuted for trespass by the Shipman estate. As a result, a fear of prosecution for trespass cannot justify ignoring the reserve gate system.

In addition, HELCO has presented ample evidence, which neither the Carpenters nor the Electricians have disputed, that indicate a motive of both unions to involve neutral employers in its dispute. For example, Davis' statements to Zito that the job had problems, questions about who allowed non-union contractors to bid as well as observations that HELCO had other projects can be construed as threats to engage HELCO in the Unions' dispute with the non-union contractors. In addition, the picketers continued to monitor neutral gates and shouted at individuals using neutral gates even while they continued to picket primary gates. Thus the unions had improper secondary motives in picketing. Liability can be premised on this secondary motive.

The Carpenters' argument that the evidence submitted by HELCO is "patently inadmissible" is without merit. The Carpenters have cited no case law to support this argument. The court has carefully scrutinized the documents submitted and does not share the Carpenters' belief that they are patently inadmissible. In fact, these are the same types of documents that are submitted to support and oppose summary judgment motives. Accordingly, there is no bar to the submission of the evidence in this case.

Accordingly, plaintiff's motion for summary judgment is GRANTED on the issue of the Carpenters' and the Electricians' liability for engaging in secondary picketing and consequently the Electricians cross-motion for summary judgment is DENIED. Since the Electricians did not picket prior to April 6, 1992, the Electricians' liability commences from that date.

## II. *Damages*

Plaintiff HELCO also asks this court to grant summary judgment as to a specific amount of damages claimed to be the result

of the Carpenters' and Electricians' unlawful picketing. Plaintiff claims it was damaged in the amount of $242,192.45 due to the unlawful picketing.

 Actual compensatory damages may be recovered under § 301 for violations of § 8(b)(4). *Local 20, Teamsters v. Morton,* 377 U.S. 252, 260, 84 S.Ct. 1253, 1258–59, 12 L.Ed.2d 280 (1964). So long as the unlawful conduct materially contributed to the loss or was a substantial factor in bringing it about, plaintiff is entitled to recover. The unlawful objective need not be the sole cause of picketing. *Frito–Lay, Inc. v. Teamsters 137,* 623 F.2d 1354, 1362–63 (9th Cir.1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981). Nor is it necessary to detail the exact amount of damages suffered; it is sufficient to show their extent as a matter of just and reasonable inference. *Id.* at 1364. The types of damages that have been recognized as recoverable under § 301 include: (1) compensation for employees who report to work, *Id.;* (2) additional compensation to resume normal operations or minimize delay, *Matson Plastering Co. v. Plasterers 66,* 852 F.2d 1200, 1202 (9th Cir.1988); (3) costs of extra guards, *Id.* at 1202; and (4) expense of sign preparation, *Abbott v. Local Union No. 142,* 429 F.2d 786, 790 (5th Cir. 1970).

While the facts of this case support an award of damages suffered as a result of the illegal picketing, there are material factual disputes as to the specific amount of damages suffered that prevent the court from granting summary judgment on this issue. Plaintiff seeks to prove damages by unsworn letters from subcontractors and has provided no proof as to whether the extra work claimed actually occurred. The cases cited by plaintiff are not contrary to this holding as damages were awarded pursuant to a full trial. *See e.g. Frito–Lay, Inc.,* 623 F.2d at 1364. This holding does not in any way validate defendants' arguments claiming that no damages were suffered. Accordingly, Plaintiff's motion for summary judgment seeking to set a specific amount of damages is DENIED. The issue of the specific amount of damages suffered by HELCO as a result of the Carpenters' and the Electricians' illegal picketing activity remains for a trier of fact to determine.

## CONCLUSION

For the reasons given, the court GRANTS in part and DENIES in part plaintiff's motion for summary judgment and DENIES defendant Electricians' cross-motion for summary judgment.

IT IS SO ORDERED.