**BEELMAN TRUCK COMPANY,**
Plaintiff–Appellee,

and

**Verlan Funk Truck Service, Incorporated,**
Intervening Plaintiff–Appellee,

v.

**CHAUFFEURS, TEAMSTERS, WAREHOUSEMEN AND HELPERS, LOCAL UNION NO. 525, Defendant–Appellant.**

No. 93–2648.

United States Court of Appeals, Seventh Circuit.

Argued March 28, 1994.

Decided Sept. 7, 1994.

Eric D. Paulsrud, John J. Gazzoli, Jr., Lewis, Rice & Fingersh, St. Louis, MO, for Beelman Truck Co.

Mark W. Weisman (argued), Robert J. Selsor, Suelthaus & Kaplan, St. Louis, MO, for Verlan Funk Truck Service, Inc.

George O. Suggs (argued), Nancy M. Watkins, Wilburn, Suggs & Watkins, St. Louis, MO, for Chauffeurs, Teamsters, Warehousemen and Helpers Local Union No. 525.

Before CUDAHY and RIPPLE, Circuit Judges, and PLUNKETT, District Judge.*

CUDAHY, Circuit Judge.

This appeal arises from a labor dispute in which Beelman Truck Company ("Beelman") and intervenor Verlan Funk Truck Service, Inc. ("Funk") allege that Local 525 contributed to the two truck companies' loss of subcontracts by picketing at a general contractor's project site. Specifically, Beelman alleged that the picketing violated § 8(b)(4) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(b)(4), for which Beelman was entitled to recover damages under § 303 of the Labor Management Relations Act of 1947, 29 U.S.C. § 187. The district court, following a bench trial, found in favor of the plaintiffs and awarded damages, including prejudgment interest, to both (approximately $45,000 to Beelman and $93,500 to Funk). We affirm.

## I.

In 1989, Alberici–Eby ("Alberici") served as the general contractor for Phase III of the Alton Lock and Dam 26 Project and solicited bids for the performance of certain trucking tasks. These tasks included hauling supply materials to the job site with tractor-trailers ("off-site" hauling) and hauling materials within the site itself with tandem dump trucks ("on-site" hauling). Ultimately, Alberici determined that it needed to use tandem trucks for off-site work as well. Alberici selected Beelman, the low bidder, to assist in both operations.

The off-site work was done pursuant to two separate arrangements. First, Beelman entered into a transportation services agreement with two materials suppliers to haul building materials to Alberici's project at agreed per tonnage rates. Alberici had approved this agreement. Second, Alberici entered into an agreement with Interface Construction Company ("Interface") to perform off-site hauling at a per tonnage rate.

With respect to the on-site hauling, Alberici entered into another subcontract with Interface to perform on-site hauling at an hourly rate. Interface then, at Alberici's direction, subcontracted this on-site work to Beelman, who then offered it to Funk. However, Beelman also used Funk to operate some of its tandem dump trucks pursuant to Beelman's transportation services agreement with the two materials suppliers (for off-site hauling). As a result, all claims for damages to Funk are contingent on the loss of on-site and off-site tandem dump truck hauling by Beelman. The arrangement between Beelman and Funk called for the two companies to share the gross revenue from the off-site tandem hauling, 88% of the revenue going to Funk and 12% going to Beelman. Neither Funk nor Beelman had a collective bargaining relationship with Local 525, although Funk's drivers belonged to Teamsters Local 50.

Shortly after Beelman and Funk began work,[1] Local 525 began to picket at the project entrance, carrying signs which accused Beelman of paying wages lower than those prescribed by area collective bargaining agreements with Local 525. The picketing resulted in a temporary shut-down of the project. Alberici expressed serious concerns to Beelman about possible future work disruptions by Local 525. During a meeting on an unrelated project, Local 525 demanded that Beelman and Funk drivers join Local 525 and that Beelman sign Local 525's standard collective bargaining agreement. Beelman and Local 525 exchanged proposals but never reached an agreement. The picketing continued for several months, leading to

---

\* The Honorable Paul E. Plunkett of the United States District Court for the Northern District of Illinois is sitting by designation.

1. The work actually begun included the hauling of materials to the job site by Beelman (through Funk). The invoices for this work were based on the per tonnage rate for tractor-trailers, but a note written on one of the invoices indicates that billing had not been adjusted to reflect the fact that the off-site hauling was performed using the more expensive tandem dump trucks. Pl.'s Ex. at 40. The significance of this note is explored more fully below, in our discussion of damages.

more work disruptions and more pressure from Alberici for Beelman to give assurances that it would resolve the labor dispute. Beelman and Alberici representatives met several times to discuss the picketing, which Alberici claimed was seriously undermining productivity at the project. Alberici's project manager and another representative told Beelman that Alberici might have to give the hauling work to another company if Beelman could not stop the labor disruptions.

On June 1, 1990, Beelman's counsel sent a letter to Interface regarding the subcontract for on-site tandem dump truck work. The district court found that Beelman, since it intended to use leased equipment owned and operated by Funk for the on-site work, wanted to modify the proposed subcontract form to something like its transportation services agreement with the materials suppliers. After speaking with Sam Beelman about the proposed subcontract, the Interface representative telephoned an Alberici representative, who told him that Alberici wanted to withdraw the work from Beelman because of the slow-down caused by Local 525's picketing. The Interface representative testified that he already understood that Alberici could not tolerate project disruptions and that Alberici wanted to remove Beelman because of the labor dispute. The Interface representative also testified that Beelman had not told him that it wanted to be relieved of the project.

Nevertheless, another Alberici employee wrote a note to the one who spoke to Interface regarding the subcontract, stating that Beelman no longer wanted to perform the on-site dump truck work. The district court gave little credence to the note in light of other testimony, the totality of the circumstances and the fact that the note did not surface until trial. Instead, the court expressly found that the disruptions caused by Local 525's picketing were the real cause of Alberici's decision, in late-July of 1990, to have Interface divert the on-site hauling work from Beelman to another trucker, Stutz Trucking ("Stutz"). Stutz was affiliated with Local 525 and some of its drivers had participated in the picketing at issue. Stutz continued to perform this portion of the work through the time of trial.

In October, 1990, when Beelman was about to commence the major off-site hauling under the transportation services agreement, Alberici and Beelman established a gate reserved for Beelman and its suppliers at the project site, hoping that Local 525 would limit its picketing to that gate. Local 525 responded by filing a grievance and then instituting a suit against Alberici for its involvement with Beelman. The union also ignored the reserved gate and continued to picket at the main entrance to the site.

Beelman ultimately filed an unfair labor practice charge against Local 525, alleging that Local 525 was picketing the project in order to pressure Beelman and Funk into agreeing to Local 525's demands, all in violation of 29 U.S.C. § 158(b)(4). The NLRB found probable cause and Beelman was able to obtain a temporary injunction against Local 525. However, the picketing sporadically resumed at the reserved gate after the injunction expired. Local 525 contended that it picketed to inform the public that Beelman paid wages below area standards, even though the union admitted that it did not know what Beelman's rates of pay were. The union did not picket at other Beelman locations.

The district court found that Local 525's "area standards" contention was pretextual, its true motivation being to coerce Alberici into diverting work from Beelman and Funk unless Beelman agreed to Local 525's terms. The court awarded damages to Beelman and Funk, which had claimed damages based only on the work actually done by the other trucking companies to which work was diverted. The court based the damages associated with the loss of off-site work on the per tonnage rate associated with the tandem trucks, even though Beelman's transportation agreement with the two materials suppliers incorporated the lower per tonnage figure associated with tractor-trailers. The court also awarded prejudgment interest.

## II.

We review the district court's factual findings only for clear error and will over-

turn these findings only if we are convinced that a mistake has been committed. *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *see also* Fed.R.Civ.P. 52(a). " 'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' " *Federal Deposit Ins. Corp. v. Bierman,* 2 F.3d 1424, 1431 (7th Cir.1993) (citing *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511).

■■■ As the district court correctly concluded, the NLRA creates a private right of action for any party who is injured by union conduct which violates 29 U.S.C. § 158(b)(4). 29 U.S.C. § 187(b). Section 158(b)(4), in turn, proscribes various forms of "secondary" boycotting and picketing activities. These provisions require that, where a union contests the job terms and conditions of a particular employer (the "primary" employer), the union must focus its picketing activity on that employer and not some of it on a "secondary" party. *Mautz & Oren v. Teamsters Local 279,* 882 F.2d 1117, 1121 (7th Cir.1989). However, especially where (as in this case) primary and secondary employers occupy a common work site, employers must show more than that picketing incidentally, but foreseeably, affects secondary employers. To prove a violation of § 158(b)(4), employees must show that the union *intended* to cause disruption of the secondary employer's business. *Id.; see also Sailors' Union of the Pacific (Moore Dry Dock),* 92 N.L.R.B. 547, 549 (1950) (specifying the general standards under which a union's activity is presumed to be lawful).

■■■ Local 525 does not challenge the district court's conclusions of law. Nor does it challenge the district court's findings that, despite its purported goal of publicizing Beelman's failure to meet area wage standards, it did not know whether Beelman did, in fact, fail to meet those standards. Indeed, the union does not even argue that the district court erred in finding that its purpose in picketing was to divert hauling work from Beelman and Funk. Rather, Local 525 contends only that the district court erred in finding that the union's picketing materially

contributed to the trucking companies' loss of the hauling work.

The union claims that the only evidence regarding the loss of hauling work shows that the loss resulted from Beelman's failure to sign the subcontract, rather than from any misconduct by the union. At best, this seems to be an overstatement. The evidence is essentially uncontroverted that Local 525 ignored the special gate that Alberici and Beelman had set up—choosing instead to picket at the main entrance to the project. Further, there was testimony at trial indicating that the form of the subcontract agreement never became an issue in Beelman's discussions with Alberici leading to Beelman's termination. Tr. 138. What the contractors did discuss was Alberici's concern about losing money as a result of the work stoppages caused by the picketing, and Alberici's insistence that Beelman solve its labor problem. Tr. 60, 188–89. Further, Beelman offered testimony to show that, while it needed the business the subcontract would provide, it indicated to Alberici that it would not fight Alberici if it decided to exclude Beelman in order to keep the project on track. The testimony suggested that Beelman made an offer so contrary to its immediate interests because it wanted to preserve its long term relationship with Alberici, which it described as "one of the top, if not [the] top, construction company in the ... area." Tr. 60–61. Ultimately, Alberici directed Interface to send a letter informing Beelman that its services would no longer be needed. Tr. 60–64. Beelman was told that the termination was "due to pressure exerted by the Teamsters." Tr. 64, 103. This motivation was further supported by testimony by Alberici employees and by a letter from Beelman to Alberici. Tr. 208–09; Pl.'s Ex. 21.

In opposition to this interpretation of the facts, Local 525 contends that Beelman voluntarily surrendered the subcontract. The union bases this contention primarily on two facts. First, it notes that, after its bid was accepted for the on-site tandem dump truck work, Beelman rejected the initial subcontract proposed by Interface on behalf of Alberici. Yet representatives of both Alberici

and Beelman testified that the form of the subcontract was not an issue on the decision to exclude Beelman. Tr. 137–38, 211. Second, the union points to a note from one Alberici employee to Alberici's chief administrator for subcontracts and purchase orders that indicated that Beelman no longer wanted the hauling work. But the district court specifically addressed this note and attached little credence to it in light of the totality of the circumstances, including the testimony of representatives of Beelman and Interface and the fact that the note did not turn up until the time of trial. Simply put, the facts to which Local 525 points—while they could, perhaps, support the union's point of view— seem less than compelling and, in any event, the district court's analysis is not so implausible that it was improper for it to settle on the interpretation of the facts that it selected. Thus, the court did not clearly err in finding that Local 525's picketing proximately caused Beelman and Funk to lose the hauling subcontract.

### III.

■ Local 525 also challenges the district court's damages calculation. In particular, the union contends that damages for the loss of off-site hauling (of the two types of materials required for the project) should have been based on rates of $2.06 per ton and $2.25 per ton, in accordance with a transportation services agreement that Beelman made with two of Alberici's suppliers and which Alberici approved. The agreement provided that Beelman would haul materials from the two suppliers to the project site in tractor-trailers. After the agreement was executed, however, Alberici discovered that it needed the off-site hauling to be done using the same tandem dump trucks that it wanted

for the on-site hauling. These tandem trucks carry less material than the tractor trailers and thus are more costly to use. The district court, in keeping with Alberici's insistence on using the more expensive tandem trucks, based damages on rates of $2.67 per ton and $2.87 per ton. These rates were derived from a proposal submitted by Beelman to Alberici before Beelman was dropped from the subcontract.

■ Local 525 contends that there is no evidence that Alberici ever accepted the proposed tandem truck rates. It claims that Beelman never resolved its claim for the higher tandem rate, a fact it suggests is borne out by several invoices wherein Beelman billed for off-site tandem hauling at the $2.06 per ton rate. Aplt.'s Sep.App. 56–71. Thus, says the union, the district court erred in applying the higher rate without finding that some agreement had replaced the original transportation agreement or that the proposed higher rate was reasonable or customary. Yet the union, on cross-examination of Beelman's president, Sam Beelman, elicited testimony indicating that Beelman got at least informal approval from Alberici, through one of Beelman's contacts at Interface.[2] Thus, there is evidence that Alberici did, at least, give some indication that the higher rate was not unacceptable. Further, Beelman's testimony was prompted by invoices for off-site hauling already begun by Beelman (through Funk) using the tandem dump trucks. A note on these invoices indicates that they were mistakenly calculated based on the lower per tonnage rate for tractor-trailers, since Alberici had originally requested tractor-trailers rather than tandems. The note said that the balances noted on the invoices were meant to capture the difference between the two rates. Thus,

**2.** Sam Beelman stated:
When [Alberici] started ordering tandems and our contract called for tractor trailer, I called Ballard Johnson with Interface, who was our contact for the operations and this sort of thing, and I told Ballard, you know, we need to establish a tandem rate, they need tandems right now. He said okay, what is it. *I gave him a quotation. He called Alberici, called me back, said it's fine. These invoices you will*

*notice there's a note on here from our accountant.* It says, "Sam, enclosed are copies of all invoices which have balance because they paid the [$2.06 per ton] trailer rate, except for invoice 91803, which has not been paid at all." Again, this was a start-up for a large project. *There was some confusion in the beginning, and it was a matter of getting it on track and ironed out.*
Tr. 125–26 (emphasis added).

Beelman's testimony and the note on the invoices seem to evidence imprecise bookkeeping rather than any concession by Beelman to the lower rate. Moreover, while the district court made no explicit finding that the higher rate was reasonable or customary, no explicit finding was required, since it may reasonably be inferred from the evidence we have noted and the overall rationale for the higher rate (i.e., that the smaller tandem trucks were less economical because of their smaller hauling capacities) that the court found the higher rate reasonable. *See Bartsh v. Northwest Airlines, Inc.*, 831 F.2d 1297, 1304 (7th Cir.1987) (factual findings adequate for clear error review if sufficiently comprehensive to disclose steps by which trial court reached ultimate conclusions).[3] Again, it is possible that Local 525's view of the facts could support a different damage award, but this is a matter reserved for the trier of fact. The district court relied on a plausible interpretation of the facts and Local 525 has not discredited that interpretation sufficiently for us to conclude that the court clearly erred.

## IV.

Finally, Local 525 contends that the district court erred in awarding prejudgment interest. Specifically, the union argues that the interest award was improper because it depended on the plaintiffs' presumably unascertainable profit margins and because the district court failed to make a specific finding that an award of prejudgment interest was appropriate.

■ Under the Labor Management Relations Act, the trial court has discretion to award prejudgment interest in an action under 29 U.S.C. § 185. *Chrysler Motors Corp. v. International Union, Allied Indus. Workers of Am., AFL–CIO, Local 793*, 959 F.2d 685, 689 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 304, 121 L.Ed.2d 227 (1992). An award of prejudgment interest, like any

damage award under the statute, is to be governed by the remedial purposes of the Act. *See Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton*, 377 U.S. 252, 260–61, 84 S.Ct. 1253, 1259, 12 L.Ed.2d 280 (1964). Although we acknowledge that the old rule requiring damages to be readily ascertainable at the time of breach has been relaxed, this court has rejected the award of prejudgment interest where damages are "entirely unclear" up until the time the trier of fact gives its verdict. *Empire Gas Corp. v. American Bakeries Co.*, 840 F.2d 1333, 1342 (7th Cir.1988) (prejudgment interest award improper where, up until time of verdict, plaintiff-seller's loss depended on unknown unit requirements and profit margins).

■ In contrast to the district court in *Empire Gas*, where both profit margins and underlying unit requirements were unknown, the district court in this case was presented with evidence that made both the amount of hauling work lost and the relevant profit margins readily ascertainable. As the district court found, Beelman and Funk limited their claim for damages to the amount of hauling actually done by the company that replaced them. This corresponds to the hauling that Beelman and Funk would have done had Alberici honored Beelman's successful bid. (Local 525 challenged only the tandem truck rate portion of the underlying damage award and, as indicated above, we find that that portion of the award was entirely proper.) Similar evidence was adduced regarding Funk's profit margin, which the district court rounded to 28%. (The court assigned Beelman a 12% margin based on the portion of gross hauling revenues it was to receive under its agreement with Funk.) On these facts, we find that the district court's factual findings with respect to damages were comprehensive enough to show how the court reached its ultimate conclusions. *Bartsh*, 831 F.2d at 1304. There was no abuse of discretion with respect to

---

**3.** In actual fact, the district court did not state explicitly why it based damages on the higher tandem truck rate, saying only that it recalculat-

ed the damages estimated by Beelman and Funk in their summaries because those estimates were not internally consistent.

prejudgment interest.[4]

AFFIRMED.

---

4. This conclusion is in accord with other circuits which have allowed the award of pre-judgment interest even if the amount of the claim is not precisely liquidated.