**KENNEDY & COMPANY, INC.; and The Weitz Company, LLC, Plaintiff,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL UNION NO. 90, Defendant.**

**No. 4:02–CV–40521.**

United States District Court, S.D. Iowa, Central Division.

April 26, 2004.

Kelly R. Baier, Bradley & Riley, Cedar Rapids, IA, for Plaintiff.

Gerry M. Miller, Andrea F. Hoeschen, Previant Goldberg Uelmen Gratz Miller &

Brueggemann SC, Milwaukee, WI, Paige E. Fiedler, Fiedler Townsend & Newkirk PLC, Johnston, IA, for Defendant.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

GRITZNER, District Judge.

This matter is before the Court on a Motion for Summary Judgment filed by Plaintiff Weitz. Co. (Clerk's No. 22) and a Motion for Summary Judgment filed by Defendant Local Union No. 90 (Clerk's No. 18). Attorneys for Plaintiffs are Kelly R. Baier and Benjamin B. Dvergsten; attorneys for Defendant are Paige Fiedler, Gerry M. Miller, and Andrea F. Hoeschen. No hearing has been requested, and the Court finds that a hearing is not necessary. The Court considers the matter fully submitted for ruling on the pending motions.

## PROCEDURAL HISTORY

The Plaintiffs, The Weitz Company, LLC ("Weitz"), and Kennedy and Company, Inc. ("Kennedy"), filed separate complaints against Defendant, International Brotherhood of Teamsters Local Union No. 90 ("Local 90" or "the Union"), individually on October 9, 2002, respectively. The Court consolidated these lawsuits on December 1, 2003.[1]

On December 4, 2003, both Weitz and Local 90 filed motions for summary judgment. While Kennedy did not file a separate motion for summary judgment, it did join Weitz in resisting the Union's motion. The Union has in turn resisted the motion filed by Weitz. Trial is scheduled for the week beginning May 17, 2004.

## BACKGROUND FACTS

Weitz is an Iowa limited liability company engaged as a construction contractor in the building and construction industry. Its principal place of business is located in Des Moines, Iowa. Weitz was the general contractor at construction projects for Wells Fargo and the Iowa Blood Center. Weitz is an employer engaged in interstate commerce within the meaning of sections 2(2), 2(6), and 2(7) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 152(2), (6), (7).

Kennedy is an Iowa corporation engaged as a construction contractor in the building and construction industry. Its principal place of business is located in Des Moines, Iowa. Kennedy was a subcontractor to J.E. Dunn and Taylor Ball on the construction project at the Allied Mutual Insurance Company Building and to Neumann Brothers, Inc., on the construction of the Iowa Judicial Branch Building. Kennedy provided drywall installation and finishing work. Kennedy is an employer engaged in interstate commerce within the meaning of NLRA sections 2(2), 2(6), and 2(7), 29 U.S.C. § 152(2), (6), (7).

Local 90 is a labor organization within the meaning of section 2(5) of the NLRA, 29 U.S.C. § 152(5). Local 90 is comprised of truck drivers, various haulers, warehouse employees, and machine operators. Local 90 has officers and representatives located in Des Moines, Iowa. The Union is the certified collective bargaining representative for employees of A–1 Ready Mix ("A–1") and Crown Redi–Mix ("Crown").

Local 90 had collective bargaining agreements with A–1 and Crown for a term of three years. The collective bargaining agreements expired on April 30, 2002. Local 90, A–1, and Crown agreed to

---

1. Originally, a third lawsuit filed by Neumann Brothers, Inc., was also part of this action; however, Neumann Brothers is no longer a party in the ongoing proceedings.

operate under the expired contract until May 10, 2002, while they attempted to negotiate a new collective bargaining agreement. The ready-mix companies and Local 90 were unable to reach a final agreement on a collective bargaining agreement by May 10, 2002. The Union went on strike against the ready-mix companies. The strike against A–1 lasted until May 27, 2002, and the strike against Crown lasted until June 25, 2002.

While Weitz had a collective bargaining agreement with Local 90 to hire union drivers, it did not employ anyone in the ready-mix business, and there was no labor dispute between Weitz and Local 90. Likewise, there was no labor dispute between Kennedy and Local 90.

Until the strike, Crown provided all of the ready-mix for the Wells Fargo Project, and A–1 provided all of the ready-mix for the Blood Center of Iowa project, the Iowa Judicial Branch Building project, and the Allied Mutual Insurance project. Neither Crown nor A–1 drivers delivered any ready-mix during their respective strikes. In addition, Weitz did not schedule or attempt to have concrete deliveries made to their construction sites on May 13, 14, or 15, 2002.

On May 13, 14, and · 15, 2002, Union members positioned themselves near the entrances to each of the four construction sites. There were no reserve gates at any of the sites. According to Local 90, Union members did not march, display picket signs, or block entrances, nor did they ask any employees of the contractors to stay away from the construction sites.

Admittedly, Union members did have some pickets signs. Some of the signs identified Crown and A–1 and were to be displayed in the event either company tried to use replacement workers to deliver ready-mix to the construction sites. The remainder of the signs were jeopardizing, area standards signs to be displayed in the event nonunion companies with below-standard wages or benefits tried to deliver ready-mix. According to Local 90, the Union instructed its members that they could only display jeopardizing or area standards signs at the constructions sites, and only if a nonunion truck was trying to make a delivery. None of the picket signs identified Weitz or Kennedy.

Weitz asserts the Union members' actions on May 13, 2002, constituted picketing by Local 90. Weitz contends that as a result of the Union's actions, Weitz employees who were union members in trades other than those represented by Local 90 refused to cross the picket to work at the Wells Fargo and Iowa Blood Center construction sites, even though there was productive work for them to do. Work on the Wells Fargo and Iowa Blood Center sites was shut down for the day as a result.

Scott Norvell, a representative of the trade organization Master Builders of Iowa, went to the picket sites to determine the objective of the pickets and to express his opinion that the picket was illegal given that there were no concrete deliveries attempted for the day. Mr. Norvell suggested to the Union members that they seek advice about the legality of their actions from their Union representatives. After contacting a Union representative, the picketing Union members remained at the work sites but took extra care to make sure that picket signs of any sort were stored out of sight.

On May 14, 2002, Union members were still present at the Wells Fargo and Iowa Blood Center construction sites, this time without picket signs but displaying American flags. Local 90 did not provide American flags to its members nor did it suggest or instruct Union members to display American flags at the sites. According to

Weitz, as a result of the actions of Local 90, Weitz employees who were union members in trades other than those represented by Local 90 refused to work at the Wells Fargo and Iowa Blood Center constructions sites.

On May 15, 2002, Union members were again present at the Wells Fargo and Iowa Blood Center construction sites and were again displaying American flags. A complaint was filed with the National Labor Relations Board ("NLRB") regarding Local 90's alleged picketing. Local 90 instructed its members to not display the American flag after Region 18 of the NLRB condemned the display of the American flag at construction sites.

Weitz contends that as a result of the actions of Local 90 at the Weitz construction sites on May 13, 14, and 15, 2002, Weitz employees who were not Teamsters did not work, and Weitz was damaged. Local 90 disagrees and contends the employees did not work because there was no work to be done due to the lawful primary strike and that the damages sought are not attributable to the Union's actions. It is uncontroverted that the strike against A–1 and Crown significantly slowed operations at all four construction sites. There were no ready-mix deliveries at any of the sites until near the end of May. Plaintiffs contend that the actions of Local 90 constituted an illegal secondary boycott and caused Weitz damages in the amount of $50,521.69, and caused Kennedy damages in the amount of $2,094.67.

## ANALYSIS

Kennedy and Weitz brought their actions pursuant to section 303 of the Labor Management Relations Act of 1947 ("LMRA") to recover damages for an alleged illegal secondary boycott engaged in by Defendant. Plaintiffs state that Local 90 violated Section 8(b)(4)(i)(B) and 8(b)(4)(ii)(B) of the NLRA, 29 U.S.C. sections 158(b)(4)(i) and (ii), by conducting an illegal secondary boycott against Weitz and Kennedy while the Union was on strike against two ready-mix concrete companies. Plaintiffs assert that Defendant also engaged in illegal signal picketing by congregating in the same locations each day, wearing clothing identifying them as members of the Teamsters Union, and displaying the American flag while stationed outside the Weitz and Kennedy job sites.

## A. Standard for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be rendered

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). To avoid summary judgment, the nonmoving party must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial. *See Celotex v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Wilson v. Southwestern Bell Tel. Co.*, 55 F.3d 399, 405 (8th Cir.1995).

The nonmoving party must go beyond the pleadings, and by affidavits, depositions, answers to interrogatories, and admissions on file, designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. While the quantum of proof that must be produced to avoid summary judgment is not precisely measurable, it must be enough evidence for a reasonable jury to return a verdict in its favor. *Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In considering a motion for summary judgment, the Court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted); *Rifkin v. McDonnell Douglas Corp.,* 78 F.3d 1277, 1280 (8th Cir.1996). "To preclude the entry of summary judgment, the nonmovant must show that, on an element essential to [its] case and on which [it] will bear the burden of proof at trial, there are genuine issues of fact." *Noll v. Petrovsky,* 828 F.2d 461, 462 (8th Cir.1987) (citing *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548). The question before this Court is whether the record, when viewed in a light most favorable to the nonmoving party, shows there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See Mansker v. TMG Life Ins. Co.,* 54 F.3d 1322, 1326 (8th Cir.1995) (citing *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548, and *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505).

**B. Plaintiff's (Weitz) Motion for Summary Judgment**

Weitz alleges that Local 90 conducted an illegal secondary boycott against Weitz by picketing its construction sites during the labor dispute between the Union and two ready-mix concrete suppliers. Weitz further asserts that Local 90 engaged in illegal signal picketing. Weitz contends the facts are undisputed and that the Court can find Local 90 engaged in an illegal secondary boycott as a matter of law and that the Union induced and encouraged employees of Weitz to refuse to work, effectively shutting down construction on the Weitz construction sites for three days. Consequently, Weitz seeks summary judgment in its favor and further seeks a damages award in an amount sufficient to compensate it for the delays caused by Defendant's alleged illegal activity.

**C. Defendant's Motion for Summary Judgment**

Defendant's motion for summary judgment is based on the Union's contention that it never authorized picketing at the construction sites, picketing did not actually take place at the sites, and the Union never asked Plaintiffs' employees to cease work. In addition, Local 90 contends that most of Plaintiffs' alleged damages are either attributable to the Union's lawful primary strike or are fixed costs that were unaffected by the work stoppage. Based on these contentions, Local 90 moves for summary judgment dismissing Plaintiffs' claims in their entirety. In the alternative, Local 90 seeks an order from the Court holding that, as a matter of law, Plaintiffs are not entitled to recover their fixed costs or any damages attributable to the primary strike.

**D. Discussion**

Three issues arise from the parties' respective motions for summary judgment. First and foremost is the issue of whether the actions engaged in by members of Local 90 constitute an illegal secondary boycott. This issue is relevant to the motions filed by both Weitz and Local 90 as each urges the Court to find in their favor as a matter of law on this issue. The second issue is whether the Union's actions are illegal secondary picketing. This issue is argued by Weitz in support of its motion for summary judgment. Finally, the third issue for the Court is whether the dam-

ages claimed by Weitz and Kennedy are proper. This issue arises from the motion for summary judgment filed by Local 90.

### 1. Secondary Boycott

Weitz contends that the actions of Local 90 on May 13, 14, and 15, 2002, constitute an illegal secondary boycott. Local 90 did not have a labor dispute with Weitz or Kennedy. Indeed, the only contemporaneous labor dispute involved the Union and two ready-mix delivery companies, Crown and A–1. Weitz argues that Union members' presence at the Weitz construction sites signaled the Union was striking and caused Weitz employees to refuse to work. Meanwhile, Local 90 contends it only engaged in primary activity protected by the NLRA and LMRA, and that if any illegal conduct did occur, it was not authorized by the Union, and furthermore the Union took affirmative action to prevent and/or rectify any such conduct.

### a. Applicable Law

Section 303 of the LMRA makes it unlawful for a labor union to engage in conduct defined as an unfair labor practice by the NLRA. 29 U.S.C. § 187(a). The NLRA prohibits secondary boycotts and secondary picketing. Section 8(b) of the NLRA provides the following:

> It shall be an unfair labor practice for a labor organization or its agents—
>
> \* \* \* \* \* \*
>
> (4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
>
> \* \* \* \* \* \*
>
> (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;
>
> \* \* \* \* \* \*

29 U.S.C. § 158(b)(4)(B). In enacting this provision, Congress intended both to preserve the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and, of equal importance, to shield unoffending employers and others from pressures in controversies of which they are not part. *See N.L.R.B. v. Denver Bldg. & Constr. Trades Council*, 341 U.S. 675, 692, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); *see also N.L.R.B. v. Int'l Union of Elevator Constructors, AFL–CIO*, 902 F.2d 1297, 1304–05 (8th Cir.1990) (discussing *Denver Building* and congressional response).

Under the NLRA, all secondary picketing is illegal. *See R.M. Perlman, Inc. v. N.Y. Coat, Suit, Dress, Rainwear & Allied Workers' Union Local 89–22–1, ILGWU*, 833 F.Supp. 238, 245 (S.D.N.Y.), *aff'd*, 33 F.3d 145 (2d Cir.1994). Secondary picketing is defined as "picketing which is calculated to involve neutral em-

ployers and employees in a union's dispute with [the] primary employer." *Hawaii Elec. Light Co. v. Int'l Bhd. of Elec. Workers, Local 1186, AFL–CIO*, 844 F.Supp. 1381, 1387 (D.Haw.1993), *aff'd*, 73 F.3d 369 (9th Cir.1995). To prevail, Plaintiffs must prove that Union members engaged in coercive activity with the intent of disrupting the Plaintiffs' business. *Beelman Truck Co. v. Chauffeurs, Teamsters, Warehousemen & Helpers, Local Union No. 525*, 33 F.3d 886, 890 (7th Cir.1994); *see also Constar, Inc. v. Plumbers Local 447*, 748 F.2d 520, 522 (9th Cir.1984) (finding the district court properly required plaintiff to prove an illegal secondary intent to prevail in secondary picketing claim, and further finding union's presence at a neutral gate was not an automatic violation of § 158(b)(4)). In other words, it is not enough to show that picketing of a primary employer incidentally, albeit foreseeably, affects secondary employers; rather, plaintiff must show the union intended to disrupt the secondary employer's business. *Beelman Truck Co.*, 33 F.3d at 890. Additionally, an essential element of picketing is some sort of confrontation between union members and those seeking to enter an employer's premises. *Chicago Typographical Union No. 16*, 151 N.L.R.B. 1666, 1669 (1965). Thus, not all patrolling constitutes picketing. *Id.*

■■ The NLRA maintains a union's right to engage in otherwise lawful primary picketing, even if it occurs at a construction site where neutral employers are present. *See Iron Workers Dist. Council of Pac. Northwest v. N.L.R.B.*, 913 F.2d 1470, 1475 (9th Cir.1990); *Solien ex rel. N.L.R.B. v. Painters Dist. Council No. 2 of Bhd. of Painters & Hired Trades, AFL–CIO*, 121 L.R.R.M. 3030, 3030–31 (E.D.Mo. 1985). Area standards picketing at a construction site is also lawful. *Carpenters Dist. Council of Detroit & Southeastern Mich. (Douglas Co.)*, 322 N.L.R.B. 612, 612 (1996); *see also Dawidoff v. Over–the–Road, City Transfer, Cold Storage, Grocery & Mkt. Drivers & Helpers, Inside Employees, Local Union No. 544*, 736 F.2d 465, 466–67 (8th Cir.1984) (denying NLRB's request to enjoin area standards picketing).

■ To determine whether picketing at a common situs is primary or secondary, courts look to the factors established in *Sailors' Union of the Pacific Moore Dry Dock Co.*, 92 N.L.R.B. 547 (1950). *See, e.g., Iron Workers Dist. Council*, 913 F.2d at 1475 (citing *Sailors' Union of the Pacific Moore Dry Dock Co.*, 92 N.L.R.B. 547, 549 (1950)). The four *Moore Dry Dock* factors are: (1) whether the "picketing is strictly limited to times when the *situs* of the dispute is located on the secondary employer's premises"; (2) whether "the primary employer is engaged in its normal business at the *situs* "; (3) whether the picketing takes place reasonably close to the *situs;* and (4) "whether the picketing discloses that the dispute is with the primary employer." *Moore Dry Dock*, 92 N.L.R.B. at 549; *see also N.L.R.B. v. Gen. Truck Drivers, Warehousemen, Helpers & Auto. Employees of Contra Costa County, Local No. 315*, 20 F.3d 1017, 1022 (9th Cir.1994); *Iron Workers Dist. Council*, 913 F.2d at 1475. Unless the picketing satisfies all four criteria, it is presumed to be secondary and therefore unlawful. *Moore Dry Dock*, 92 N.L.R.B. at 549. On the other hand, where a union engages in picketing at a site where both the primary and secondary employers are potentially performing work, a union acts within legal bounds if it satisfies the *Moore Dry Dock* criteria. *Id.* In other words, if the Union adheres to these standards, its conduct is presumed lawful and Plaintiffs have the burden of proving unlawful intent. *Beelman Truck Co.*, 33 F.3d at 890.

### b. Elements of Illegal Secondary Boycott

■ The Union contends it satisfied all of the *Moore Dry Dock* criteria. Meanwhile, Plaintiffs contend that in applying the factors established in *Moore Dry Dock*, Local 90's picketing is secondary and illegal.

The first factor is whether the picketing is strictly limited to times when the situs of the dispute is located on the secondary employer's premises. Plaintiffs argue the picketing was not limited to only those times that the struck employers were present at the Wells Fargo and Iowa Blood Center construction sites. In fact, during the course of Local 90's presence at the Weitz construction sites, no ready-mix company with which Local 90 had a dispute made or attempted to make any deliveries. Despite the fact that the ready-mix companies were not attempting deliveries, Local 90 continued to maintain a very visible presence by displaying American flags and Union insignia at the Weitz and Kennedy construction sites. Weitz claims its employees refused to work because of the Union's actions.

Meanwhile, Local 90 contends it limited picketing to times when the primary employers or nonunion employers paying below union scale were at the construction site. While the primary employers were not at any of the construction sites on May 13, 14, or 15, neither did the Union engage in picketing on those days. The picket signs were kept in pickup trucks on the first day of the strike and were not even visible on May 14 or 15. Furthermore, Union members did not block or patrol site entrances as would be expected of picketers. Instead, the Union was prepared to engage in primary or area standards picketing if offending ready-mix trucks arrived but refrained from all picketing in the absence of ready-mix truck deliveries.

The only exception occurred early on May 13 when some signs were visible, but this was quickly rectified by Union representatives.

The second factor is whether the primary employer is engaged in its normal business at the situs. According to Plaintiffs, the struck primary employers, A–1 and Crown, were not engaged in their normal business at Weitz and Kennedy construction sites on May 13, 14, or 15, 2002. It is undisputed that no deliveries by A–1 or Crown were scheduled or attempted on May 13, 14, or 15, at any of the Weitz or Kennedy construction sites. Additionally, Local 90 did not contact Weitz or one of the ready-mix companies to determine if concrete deliveries were scheduled for the Weitz construction sites at the time Union members were to be present. Despite the complete absence of A–1 and Crown from the construction sites, Local 90 continued their actions at the construction sites, and the Weitz and Kennedy union employees refused to work.

Local 90 indicates it is this factor upon which Plaintiffs may have the best argument. The Union asserts, however, that Weitz merely relies on the Union members' mere presence at the construction site to demonstrate illegal secondary activity. Local 90 correctly states that mere presence at a common site is insufficient to establish illegal secondary activity. *See Hendrix ex rel. N.L.R.B. v. Int'l Union of Operating Eng'rs, Local 571*, 592 F.2d 437, 445 (8th Cir.1979) (finding injunction which enjoined union from picketing nonprimary employer "for any purpose" was overbroad, as only activity prohibited by the NLRA may be enjoined). Indeed, the NLRA explicitly protects certain types of activities involving a presence at a neutral employer's site. *See, e.g., Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568,

586, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (finding the publicity proviso of the NLRA protects handbilling).

The Union maintained its right to conduct lawful primary and area standards picketing. Union members' presence at the construction sites was to facilitate engagement of those rights as there was a possibility ready-mix vehicles would arrive at the sites. These ready-mix vehicles would have to be delivered by one of the struck companies using replacement drivers, or by nonunion ready-mix companies paying wages and benefits below union scale. Indeed, contractors did arrange for nonunion companies to deliver ready-mix to the sites during the strike.[2] Union members displayed area standards, or jeopardizing, pickets when these trucks arrived. Local 90 contends this was the only picketing that occurred at the sites, and that it was lawful area standards picketing. Otherwise, it is argued, no picketing occurred at the construction sites, and therefore Union members engaged in no picketing that offends the *Moore Dry Dock* standards.

In addition, Local 90 avers it was sensible to have members, with picket signs available, at the construction sites to picket if the struck ready-mix companies or certain nonunion ready-mix companies attempted to deliver ready-mix to the sites during the pendency of the strike. *See Solien*, 121 L.R.R.M. at 3030–31 (finding union lawfully posted an observer at a neutral gate to ensure that it was not being used by the primary employer). Moreover, Local 90 argues that being prepared to picket is not prohibited by the NLRA and LMRA. *See, e.g., Amalgamated Packinghouse*, 218 N.L.R.B. 853, 854 (1975) (finding threats to engage lawful primary product picketing at a secondary employer's location is not a violation of the NLRA).

The third factor is whether the picketing takes place reasonably close to the situs. Plaintiffs contend Local 90's actions were very visible and close to the Weitz and Kennedy construction sites and that regardless of the proximity of Local 90 to the job site, no primary employer was scheduled to be at a construction site during the days at issue in this lawsuit, nor did any primary employer attempt deliveries to the construction sites on those days.

Local 90 contends, however, that Union members were positioned near construction site entrances used for ready-mix deliveries. There were no other entrances more appropriate for primary or area standards picketing.

Finally, the fourth factor is whether the picketing discloses that the dispute is with the primary employer. Plaintiffs assert that the congregating Union members failed to identify the employers with whom they were in dispute. After putting away their orange "On Strike" signs, Local 90 displayed American flags and Union insignia.[3] The use of the American flag and Union insignia does not identify the employers with whom Local 90 had a dispute. Nevertheless, according to Plaintiffs, it was clear to the Weitz and Kennedy employees who refused to cross Local 90's picket line that the Union was in fact picketing someone at the construction sites. Plaintiffs claim that in response to

2. Neumann Brothers, one of the original Plaintiffs in this case, did use a nonunion company to deliver concrete to the Iowa Judicial Building construction site on May 15. Union members displayed picket signs and some other trades became uncooperative, but this incident forms no part of the current complaint against Local 90.

3. The Union insignia included bumper stickers and T-shirts indicating an affiliation with the Teamsters Union.

the actions of Local 90, the union employees of Weitz and Kennedy refused to work. Contrary to the statement made by Local 90 in its brief in support of its motion for summary judgment, Weitz and Kennedy do not admit that Local 90 did not engage in picketing on May 13, 14, or 15. In fact, Weitz and Kennedy argue that the use of the American flag in lieu of picket signs at the very least constituted illegal signal picketing.

According to Local 90, all of the available picket signs either identified the struck companies or protested area standards violations. None of the available signs mentioned Plaintiffs or any other businesses operating on the construction sites. The NLRB ordered Local 90 to discontinue using the American flag to signal their picket. The Union complied with this order when it was received.

The *Moore Dry Dock* standards are an evidentiary tool for determining illegal secondary action. *See Iron Workers Dist. Council,* 913 F.2d at 1475 (9th Cir.1990) (citations omitted). "Thus, 'the inference of primary activity raised by compliance with the *Moore Dry Dock* standards may be dispelled if the totality of the circumstances [indicates] the union's objective is secondary,'" and vice versa. *Id.* (quoting *Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Local No. 433 v. N.L.R.B.,* 598 F.2d 1154, 1157 (9th Cir. 1979) (citations omitted)).

The Court finds that genuine issues of material fact still remain to be resolved. A reasonable person could determine that the Union had no secondary intent in congregating at the construction sites and that Union members' actions fell within the realm of protected conduct. On the other hand, a reasonable person could also find that the Union did have an intent to influence and coerce the Plaintiffs' employees to stop work during the strike against the ready-mix companies. Ultimate resolution of these issues is dependant on whether the short time picket signs were out on May 13, and the subsequent use of American flags on May 14 and 15, is picketing that was intended to disrupt the Plaintiffs' business. In short, genuine issues of material fact remain as to the intent of Local 90 based on the actions of the Union members on May 13, 14, and 15 at the construction sites.

**c. Affirmative Steps to Prevent**

A union is only liable for its members' illegal secondary activity if the union participated in or authorized its members to participate in those activities. *Consolidation Coal v. Local 2216, United Mine Workers of America,* 779 F.2d 1274, 1277 (7th Cir.1985). A union must, however, take responsibility for the foreseeable consequences of its actions. *See Int'l Longshoremen's Ass'n, AFL–CIO v. Allied Int'l, Inc.,* 456 U.S. 212, 224, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982). Moreover, a union is chargeable with the knowledge of the effect that its activities will have on a neutral employer's employees. *Local 761, Int'l Union of Elec., Radio & Mach. Workers, AFL–CIO v. N.L.R.B.,* 366 U.S. 667, 673, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961) (" '[I]ntended or not, sought for or not, aimed for or not, employees of neutral employers do take action sympathetic with strikers and do put pressure on their own employers.' ") (quoting *Seafarers Int'l Union v. N.L.R.B.,* 265 F.2d 585, 590 (D.C.Cir.1959)). For liability to be found, a plaintiff must establish that the union either authorized the illegal conduct or had knowledge of the conduct and failed to disavow it and take corrective action. *Plumbers Local 195 (McCormack–Young),* 233 N.L.R.B. 1087, 1088 (1977). The Court notes, however, that "picketing which induces secondary employees to re-

spect a picket line is not the equivalent of picketing which has an object of inducing those employees to engage in concerted conduct against their employer in order to force him to refuse to deal with the struck employer." *Local 761, Int'l Union of Elec., Radio & Mach.,* 366 U.S. at 673–74, 81 S.Ct. 1285.

█ Local 90 argues that the Union cannot be held liable for the unsanctioned acts of its members engaged in alleged illegal secondary activity. Local 90 contends that it ratified the primary strike but gave explicit instructions as to how to picket the construction sites, including written instructions to picket only ready-mix trucks and to refrain from asking other employees to stop work. The Union provided its members only with strike signs naming Crown and A–1 and signs protesting jeopardizing conditions. Moreover, when the Union received complaints that picket signs were visible at the construction sites,[4] it immediately addressed those concerns, and by the following day and thereafter, picket signs were no longer visible at the construction sites.

While for the most part picket signs were not used, American flags were displayed by the Union members. Local 90 claims that the use of American flags at the construction sites was a "grass roots effort" that was unauthorized by the Union. Plaintiffs contend the use of the American flags was at least ratified by the Union, as Local 90 did not take any steps to correct the illegal actions of its members while the actions became the subject of an unfair labor practice filed with the NLRB. *See BE & K Constr. Co. v. N.L.R.B.,* 23 F.3d 1459, 1466–67 (8th Cir. 1994) (defining ratification as the affirmance by a person of a prior act that did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him) (citations omitted); *see also Nat'l Cash Register Co. v. N.L.R.B.,* 466 F.2d 945 (6th Cir.1972) (finding the union liable for the unlawful picketing of its members, and deeming it significant that the union made no effort to disavow either the union hall statements of its agents or the picket line incidents). According to Plaintiffs, it was only after the NLRB found that the use of the American flag was improper that Union members discontinued using the American flag. Local 90 disputes the characterization that it ratified the use of the American flags, but rather asserts it went to each of the four construction sites to make sure its members did not display the flag as soon as the NLRB ordered the flags removed.

Again, the Court finds there still remain genuine issues of material fact in the determination of whether Plaintiffs have shown Local 90 authorized or otherwise acquiesced in the actions of its members, in addition to whether the Union took the proper steps to avoid offending conduct by its members. Moreover, resolution of this issue depends in part on the determination of whether the Union members' actions even constituted illegal secondary activity.

## 2. Signal Picketing

█ Signal picketing is defined by the NLRB as activity that acts as a signal that sympathetic action on the part of neutral employees is desired by the union, *Iron-Workers Dist. Council of Pac. Northwest (Hoffman Constr.),* 292 N.L.R.B. 562, 563 n. 2 (1989), and can constitute illegal sec-

---

**4.** Local 90 admits that in spite of the instructions the Union gave its members, the picketing Union members displayed orange "On Strike" signs on May 13, 2002, the first day of the strike against Crown and A–1.

ondary activity violative of the NLRA. The NLRB has found that signal picketing as a secondary boycott can be established by the presence of union representatives at the site entrances with picket signs, even if patrolling with picket signs did not occur. *United Mine Workers of America, Dist. 2 (Jeddo Coal Co.)*, 334 N.L.R.B. No. 86 (2001), *available at* 2001 WL 838569, *18. In addition, the NLRB has also found that a gathering of union representatives near the entrance of a construction site during the early morning hours, when neutral employees would customarily be reporting to work, may constitute prohibited signal picketing under some circumstances. *Int'l Union of Operating Eng'rs, Local No. 12 (Hensel Phelps Constr. Co.)*, 284 N.L.R.B. 246, 248–49 (1987). In neither of these cases, however, did the NLRB hold that mere presence at a neutral site constituted secondary activity outlawed by the labor acts.

■ Weitz contends that the Union engaged in illegal signal picketing. After being told by their Union representatives to only display picket signs when ready-mix companies made deliveries, Union members continued to congregate at the Weitz job sites, wore Union clothing, and displayed American flags to demonstrate they were on strike. Weitz further contends Local 90 took no steps to notify other crafts that their strike was aimed at the ready-mix companies and not at Weitz. According to Weitz, when other trade employees were asked why they were not going to work, the union members in other trades responded that they were not going to cross the Teamsters picket. These neutral employees believed the congregating members of Local 90 were picketing and that this belief caused them to refuse to report to work. Weitz further contends that it was foreseeable to the Union that

its members' actions would have this effect on neutral employees of other trades.

Foreseeability is not presumed, however, as even true picketing of a secondary employer's premises does not create an irrebuttable presumption as to the probable consequences of the picketing. *See N.L.R.B. v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58, 72–73, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964) (finding test is not whether secondary employer "suffered or was likely to suffer economic loss"). Whether picketing is intended or calculated to "induce or encourage" employees of secondary employers to engage in a work stoppage or refusal to perform services should be determined by the totality of the evidence, not by an *a priori* assumption. *Fruit & Vegetable Packers, Local 760, IBT (Tree Fruits Labor Relations Comm., Inc.)*, 132 N.L.R.B. 1172, 1176–77 (1961), *judgment vacated*, 377 U.S. at 73, 84 S.Ct. 1063. Consequently, Local 90 contends that it is at best a disputed fact as to whether the Union should have foreseen that the presence of its members at the work sites would cause a work stoppage.

In addition, the Union argues that foreseeability alone cannot transform otherwise legal conduct into illegal secondary activity. The *Moore Dry Dock* standards do not even consider foreseeability. *See also Allied Int'l, Inc.*, 456 U.S. at 224, 102 S.Ct. 1656 (finding foreseeability relevant in determining damages, and rejecting argument that union did not foresee that refusing to handle a shipper's cargo would result in disruption of the shipper's business as facially implausible). However, unions are responsible for the foreseeable consequences of their actions, especially where such actions can reasonably be expected to severely harm neutral parties. *Id.* (citing *N.L.R.B. v. Retail Store Em-*

*ployees,* 447 U.S. 607, 614 n. 9, 100 S.Ct. 2372, 65 L.Ed.2d 377 (1980)).

Once again, the Court finds that fact questions remain on the issue of whether the Union members' actions of congregating at the construction sites, having some, albeit limited, Union insignia, and displaying American flags constitute signal picketing in that these actions were intended to act as a signal to neutral employees that Local 90 wanted them to act in a certain way, i.e., to not cross the picket line and to refuse to work.

According to Weitz, whether classified as secondary picketing, signal picketing, or both, the actions of Local 90 were illegal and directly damaged Weitz. As a neutral employer, Weitz was not a proper target of the picketing. Accordingly, Weitz claims it is entitled to judgment as a matter of law. Local 90, on the other hand, contends it did not engage in conduct that could be classified as any sort of illegal secondary activity. Local 90 asserts its actions were proper and protected and that it is thus entitled to judgment as a matter of law. As the Court has heretofore indicated, neither party will be granted judgment as a matter of law at this stage of the proceedings as genuine issues of material fact remain.

**3. Damages**

Local 90 contends that as a matter of law the Plaintiffs are unable to recover most of their alleged damages. The Union contends the damages sought by Plaintiffs are unavailable for the following reasons: (1) a company is not entitled to recover damages attributable to a lawful, primary strike; and (2) there is no causal relationship between certain categories of damages and the alleged secondary boycott.

**5.** These amounts are provided in Weitz' appendix in support of its motion at pp. 30–39. Michael Tousley, president of Weitz' Iowa di-

In the event the Court does not grant the Union's motion for summary judgment in its entirety, Local 90 requests in the alternative that the Court dismiss Plaintiffs' claims for damages attributable to lawful, primary activity, and damages for fixed costs not causally connected to the alleged secondary activity.

Weitz contends that it was damaged as a result of the alleged illegal secondary and signal picketing. Weitz contends it was damaged in an amount representing lost construction days, increased rental expenses, and other expenses necessary to the completion of construction projects. The total amount of damages Weitz claims was caused by Local 90 is $50,521.69, $42,575.37 for the Wells Fargo project plus $7,946.32 for the Iowa Blood Center project.[5] Kennedy also claims it was damaged as a result of the Union's actions. The total amount of damages Kennedy claims was caused by Local 90 is $2,094.67.

**a. Damages Attributable to a Lawful, Primary Strike**

Section 303 of the LMRA allows recovery only for actual, compensatory damages. 29 U.S.C. § 187(b). An employer is not entitled to damages caused by primary activity even if the offending union contemporaneously engages in illegal secondary activity. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 729–32, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton,* 377 U.S. 252, 261–62, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964); *Riverside Coal Co. v. United Mine Workers of America,* 410 F.2d 267, 275 (6th Cir.1969).

vision, addressed each item of claimed damages in his deposition.

Local 90 contends Weitz is not entitled to recover its claimed damages because the undisputed material facts show that alleged secondary activity was not the cause of Weitz' alleged damages. Presumably, Local 90 also argues Kennedy's alleged damages were not attributable (at least in part) to the alleged secondary activity.

The primary strike against A–1 and Crown significantly slowed operations at all four construction sites. Prior to the strike, A–1 and Crown were delivering large amounts of ready-mix to the construction sites on a daily basis.[6] No ready-mix was delivered to any of the sites from May 13 until near the end of May. As soon as deliveries resumed,[7] Weitz employees had to work overtime on the Blood Center of Iowa project to catch up on concrete work.

According to the Union, construction site employees of Weitz are mostly members of the Carpenters Union and the Laborers Union. Laborers and carpenters have many duties related to the preparation for concrete pours, pouring concrete, and finishing concrete. Work records for May 10, 2002, indicate that Weitz employees at the relevant construction sites spent significant time doing work that was dependant on the availability of ready-mix.

Weitz claimed damages in the amount of $7,000.00 for premium time, which Local 90 claims were for concrete pours following the resumption of ready-mix deliveries after the Union's strike. Local 90 claims that Weitz has conceded it would have had to do concrete pours on premium time even if their employees had worked May 13, 14, and 15. In other words, Local 90 contends that the increased costs were related to the lawful, primary strike against A–1 and Crown, as this strike prevented delivery of concrete to the construction sites. As a result, the fact that Weitz employees did not work May 13, 14, and 15 was related to the lack of work that came about as a result of primary activity, and not because of the actions of Union members located at the four sites on those days. The Union does not dispute that some Weitz employees left the work sites during the first few days of the primary strike. The Union does assert, however, that the undisputed evidence demonstrates that if Weitz' employees had remained at work, they would have had little to do without deliveries of ready-mix. In addition, Weitz completed its work on the Wells Fargo Building and the Blood Center of Iowa Building on schedule.

According to Plaintiffs, Local 90 erroneously states that Weitz has admitted that the delay damages in this case are attributable to the primary strike against A–1 and Crown. Plaintiffs assert the delay damages suffered by Weitz and Kennedy are nonspeculative and were directly caused by Local 90's alleged illegal secondary activity. Plaintiffs contend it is undisputed that there was ample productive work for Weitz employees to do, despite the fact that no ready-mix product was

6. There are up to 10 cubic yards of ready-mix in one ready-mix truck. Before the strike, Crown provided between 10 and 50 loads of ready-mix per day to the Wells Fargo project during the summer months. A–1 provided 30 to 40 loads of ready-mix each week to the Blood Center of Iowa construction site.

7. Delivery of ready-mix to the Blood Center site resumed May 29, 2002, and between May 29 and May 31, A–1 delivered 19 loads, or 128 cubic yards, of ready-mix to the Blood Center construction site. Delivery of ready-mix to the Wells Fargo site resumed May 30, 2002, with A–1 making the deliveries while the Union was still on strike against Crown. On May 30 and 31, A–1 delivered 35 loads, or 243.5 cubic yards, of ready-mix to the Wells Fargo site.

being delivered because of the strike. Additionally, as a drywalling and finishing company, Kennedy's work was not directly related to the delivery of ready-mix. The presence of the employees at the construction site was important to Kennedy's completion of the work. Weitz and Kennedy claim they lost three days of production from the employees who refused to cross the picket lines.

Consequently, Plaintiffs contend the lost time had to be made up through premium or overtime work, and as a result Weitz and Kennedy were damaged by the work stoppage. Weitz and Kennedy claim they were only able to make up the lost time by rescheduling and accelerating the work to be in a position to finish the project on schedule. Weitz and Kennedy further argue their damages should not be discredited because of their efforts to reschedule the work to be done to reduce the impact of the work stoppage caused by the alleged secondary boycott. Accordingly, Plaintiffs argue that three days without employees who had productive work to do proximately caused the damages both Weitz and Kennedy seek in this case.

### b. Causal Connection Between Damages and Alleged Secondary Boycott

 As previously stated, the LMRA allows recovery only for actual, compensatory damages. 29 U.S.C. § 187(b); *Morton*, 377 U.S. at 261–62, 84 S.Ct. 1253. Damages must be both nonspeculative and proximately caused by an illegal secondary boycott to be recoverable under the NLRA. *Pickens–Bond Constr. v. United Bhd. of Carpenters*, 586 F.2d 1234, 1242 (8th Cir.1978) (citing *Fed. Prescription Serv., Inc. v. Amalgamated Meatcutters*, 527 F.2d 269, 280 (8th Cir.1976)). As one court noted,

[w]here, as in this case, the full profit on a project is ultimately received by an enterprise, overhead is covered to the full extent contemplated by the contract. Therefore, an award for overhead absent a showing of lost profit will constitute double recovery.

*American Bridge Div., U.S. Steel v. Int'l Union of Operating Eng'rs*, 772 F.2d 1547, 1552 (11th Cir.1985) (citations omitted). However, if a project is completed ahead of schedule, contemplated overhead costs are saved and profits are increased. *See Noranda Aluminum v. United Bhd. of Carpenters & Joiners of America, AFL–CIO*, 528 F.2d 1304, 1309–10 (8th Cir.1976) (allowing utility overhead paid to cost plus fixed fee contractors for a period of thirty days due to a work stoppage as reasonable approximation of damages).

Weitz also claims damages for "general conditions", which Local 90 asserts are costs incurred every work day regardless of whether there is productivity. Local 90 posits that Weitz has erroneously claimed these overhead costs. These costs are fixed and would have been incurred regardless of the work stoppage. They are not delay damages. As noted earlier, Weitz completed its work on the Wells Fargo Building and the Blood Center of Iowa Building on schedule.

Of Kennedy's claimed damages, at least $912.80 is for equipment that was rented on a weekly or monthly basis according to Local 90. For example, Kennedy claimed damages for management's mobile phone rental for three days even though the phones were on monthly contracts. Additionally, Kennedy claimed damages for scaffolds being rented by the month even though Kennedy would have received no credit for returning the scaffolds early. Another $104.56 of Kennedy's claimed damages is for rental of equipment after the alleged work stoppage, which Kennedy

rented but did not pay for during the alleged work stoppage. Kennedy also completed its work on the Allied Mutual Building and the Judicial Branch Building on schedule.

While it is true that Weitz and Kennedy finished their respective projects on schedule, Weitz and Kennedy argue that they could have finished their projects earlier if the Union's secondary picketing had not caused the work stoppage. According to Plaintiffs, the three day labor stoppage eliminated the opportunity for Weitz and Kennedy to finish ahead of schedule, thereby eliminating the chance to save on budgeted overhead costs. Essentially, three days' production was lost. Thus, Plaintiffs assert the overhead costs associated with the three days without production are appropriately included in the damages claimed by Weitz and Kennedy.

In addition, according to Plaintiffs, the argument that the expenses were scheduled to be incurred during the month the work stoppage occurred ignores the fact that as a result of Local 90's alleged secondary picketing and the resulting work stoppage, Kennedy was unable to use the rented equipment, thereby wasting days that were scheduled to be productive. The monthly rentals Kennedy agreed to contemplated a certain number of days of use. Kennedy was unable to use the rented equipment during the work stoppage, and therefore the damages claimed represent the lost use of the equipment, regardless of the fixed nature of the rental agreement.

It is obvious that an employer should not be able to reap an award for damages that include damages attributable to lawful, primary activity protected by the labor acts. In addition, damages not causally connected to the alleged illegal conduct will be prohibited. The record before the Court is insufficient to determine whether any of the damages Weitz and Kennedy seek are either related solely to the primary strike or otherwise are fixed costs not causally connected to illegal secondary activity as Local 90 contends. Therefore, the Court declines to enter an order at this stage of the proceedings limiting the amount of damages available if the Plaintiffs are successful.

## CONCLUSION

Based on the foregoing, the Motion for Summary Judgment filed by Weitz (Clerk's No. 22) is **denied**. Further, the Motion for Summary Judgment filed by Local 90 (Clerk's No. 18) is **denied**.

**IT IS SO ORDERED.**